

RECEIVED IN CLERK'S OFFICE
U.S.D.C. - Gainesville

JUN - 2 2026

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| LOUIS FRANCIS FABEC, individually, | } |
| | } |
| Plaintiff, | } |
| | } |
| v. | } Civil Action No. **1: 26 - C V - 0 0 3 0 7 3** |
| | } |
| POPSOCKETS LLC, a Colorado limited liability | } COMPLAINT FOR PATENT |
| company; DAVID BARNETT, individually and as | } INFRINGEMENT, RICO VIOLATIONS, |
| Founder, former Chief Executive Officer, and | } ANTITRUST VIOLATIONS, FRAUD ON |
| Chairman of the Board of PopSockets LLC; | } THE COURT, TORTIOUS |
| WALMART INC., a Delaware corporation; | } INTERFERENCE, AND RELATED |
| AMAZON.COM, INC., a Delaware corporation; | } CLAIMS |
| and AMAZON.COM SERVICES LLC, a Delaware | } |
| limited liability company, | } JURY TRIAL DEMANDED |
| | } |
| Defendants. | } |

---

## NATURE OF THE ACTION

KEY UNDISPUTED FACT

From 2022 through 2025, PopSockets filed IP complaints against Plaintiff's FAB POPS products through Amazon's Brand Registry. **Amazon cleared every single one of those complaints** — ruling in Plaintiff's favor in over **529 separate appeal proceedings** and finding **no infringement in every instance.** every IP claim PopSockets asserted against Plaintiff's products from 2022 through 2025 was without merit. PopSockets' July 2, 2025 written retraction confirmed the complaints were "improper" and "false."

1. This is an action for patent infringement, civil RICO violations, antitrust violations, fraud on the court, tortious interference with business relations and contract, malicious prosecution, abuse of process, defamation and trade libel, unfair competition, and unjust enrichment. Defendants conducted a seven-year campaign to destroy Plaintiff's patented phone grip technology business through systematic fraud, 557 or more false intellectual property complaints, and obstruction of federal proceedings. Amazon cleared every complaint Defendants filed against Plaintiff's products — 529 separate determinations of no infringement — yet Amazon simultaneously sells the infringing product as direct Seller and Shipper, generating over 5 million annually from technology Plaintiff patented in 2018, two years before the industry term "MagSafe" existed. Plaintiff seeks compensatory damages, treble damages under 35 U.S.C. § 284 and 18 U.S.C. § 1964(c), injunctive relief, and disgorgement of all profits attributable to infringement.

2. Plaintiff is the inventor and individual owner of three United States patents covering expandable magnetic phone grip technology, with commercial use dating to April 1, 2018 — six months before PopSockets claimed first use of its competing products — and patent filings in November 2018, forty-two days before PopSockets filed its trade dress applications. Plaintiff owns these patents in his individual capacity.

3. Since 2018, Defendants have filed over 557 false intellectual property complaints across Amazon, Etsy, eBay, and other platforms against Plaintiff's patented products. These false complaints have: destroyed Plaintiff's American manufacturing operations and 2,200 U.S. manufacturing investment; terminated a substantial Walmart national retail distribution agreement; collapsed a substantial Balaji Trading/Cricket Wireless partnership; eliminated distribution relationships with Valor Communications and Cesium Telecom; caused the loss of Plaintiff's warehouse operations; and

suppressed Plaintiff's Amazon revenue to /bin/sh.00 as of the filing date of this Complaint — while Defendants collectively generate over 5,840,000 annually selling the same technology that Plaintiff patented in 2018. Causing damages to Plaintiff individually in an amount to be determined at trial. Amazon.com itself — having cleared every single PopSockets IP complaint filed against Plaintiff's products from 2022 through 2025, ruling in Plaintiff's favor in 529+ separate appeal proceedings and finding no infringement in every instance — is the direct Seller and Shipper of the infringing PopSockets MagSafe kit products, generating direct infringement revenue from every transaction.

4. PopSockets itself admitted in a written retraction dated July 2, 2025 that its complaints against Plaintiff's products were "improper" and "false."

5. Defendants further committed fraud on this Court by filing Case No. 1:22-cv-04521-SCJ against five defendants including Plaintiff's business partners Yer Thao and Alu Solomon Chukwu using deliberately incorrect addresses to prevent service and secure default judgments — while simultaneously serving Plaintiff and his corporate entities at correct addresses, proving deliberate selective fraud.

6. That fraudulent federal lawsuit was filed immediately before a critical TTAB proceeding, triggering automatic suspension of Plaintiff's trademark cancellation petitions under 37 C.F.R. § 2.117(a) — an additional act of obstruction of federal proceedings.

---

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over Plaintiff's patent infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8. This Court has subject matter jurisdiction over Plaintiff's RICO claims pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331.

9. This Court has subject matter jurisdiction over Plaintiff's antitrust claims pursuant to 15 U.S.C. § 15 and 28 U.S.C. § 1337.

10. This Court has subject matter jurisdiction over Plaintiff's trademark cancellation claims pursuant to 15 U.S.C. § 1119 and 28 U.S.C. §§ 1331 and 1338.

11. This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367.

12. Venue is proper in this District for all non-patent claims pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, Plaintiff resides and operates his business in this District at 1498 Buford Highway Suite C #122, Buford, Georgia 30518, and all Defendants have conducted business in and directed tortious acts into this District.

13. Venue is proper in this District for patent infringement claims pursuant to 28 U.S.C. § 1400(b) as follows: (a) Defendant Walmart Inc. — Walmart maintains regular and established places of business in this District, including the Buford Drive Buford Supercenter, Buford, Georgia (Gwinnett County), and multiple additional retail stores in the Northern District of Georgia, Gainesville Division. Walmart has committed acts of direct patent infringement in this District by selling the Accused Products at these locations; (b) Defendant Amazon.com, Inc. and Amazon.com Services LLC — Amazon maintains regular and established places of business in this District, including fulfillment centers in Braselton, Georgia (Hall County) and elsewhere in the Northern District of Georgia. Amazon has committed acts of direct patent infringement in this District by selling and shipping the Accused Products to customers located in this District; and (c) Defendant PopSockets LLC — PopSockets maintains a regular and established place of business in this District through its authorized distributor AlphaComm, located at 1500 Lakes Parkway, Lawrenceville, Georgia 30043 (Gwinnett County, Northern District of Georgia, Gainesville Division). AlphaComm distributes PopSockets' products — including the Accused Products — within this District. PopSockets has committed acts of patent infringement in this District through the distribution, marketing, and sale of infringing products through AlphaComm, Walmart retail stores in this District, and Amazon's Braselton fulfillment center. Venue for patent claims against PopSockets is therefore proper in this District under 28 U.S.C. § 1400(b) and TC Heartland LLC v. Kraft Foods Group Brands LLC, 137 S. Ct. 1514 (2017).

14. This Court has personal jurisdiction over Defendant PopSockets LLC because: (a) PopSockets maintains a regular and established place of business in this District through its authorized distributor AlphaComm at 1500 Lakes Parkway, Lawrenceville, Georgia 30043; (b) PopSockets conducts substantial business in this District through AlphaComm, Walmart stores, and Amazon; (c) PopSockets has purposefully directed

its unlawful IP enforcement conduct at Plaintiff, a Georgia resident, knowing the harm would be felt in Georgia; and (d) the causes of action arise directly from PopSockets' contacts with this District.

15. This Court has personal jurisdiction over Defendant David Barnett because Barnett, as Founder, former Chief Executive Officer, and Chairman of the Board of PopSockets, personally authorized and directed the unlawful conduct described herein, causing harm to Plaintiff in this District.

---

## PARTIES

16. Plaintiff Louis Francis Fabec is an individual residing at 1498 Buford Highway Suite C #122, Buford, Georgia 30518. Plaintiff is an 18-year United States Navy veteran and inventor who has held United States patents for expandable magnetic phone grip technology since 2018. Plaintiff is the sole inventor and owner of all right, title, and interest in the patents-in-suit. Plaintiff additionally owns U.S. Trademark Registration No. 6,125,522 for the mark AIRPOP TECHNOLOGY (registered August 11, 2020) and has used the FAB POPS mark in commerce since April 1, 2018, as established by prior Registration No. 6,665,645 and current application Serial No. 99501585, both in his individual capacity. On April 10, 2026, the USPTO issued a Nonfinal Office Action on Serial No. 99501585 in which Examining Attorney Christopher Buongiorno of Law Office 102 expressly stated: 'The trademark examining attorney has searched the USPTO database of registered and pending marks and has found no conflicting marks that would bar registration under Trademark Act Section 2(d).' This official USPTO finding — that FAB POPS does not conflict with any registered or pending mark including PopSockets' POP trademark Registration No. 5,662,835 — is conclusive evidence that every complaint PopSockets filed using the POP mark against Plaintiff's FAB POPS products was without legal basis. The only issue identified in the Office Action was a purely procedural domicile address requirement, not any substantive trademark conflict.

17. Defendant PopSockets LLC is a Colorado limited liability company with its principal place of business at 1426 Pearl Street, Suite 400, Boulder, Colorado 80302 (Colorado Secretary of State Entity ID No. 20101621431). PopSockets is engaged in the design, manufacture, marketing, and sale of phone grip accessories and related products throughout the United States, including in this District. PopSockets maintains

a regular and established place of business in this District through its authorized distributor AlphaComm, located at 1500 Lakes Parkway, Lawrenceville, Georgia 30043 (Gwinnett County), through which PopSockets distributes its products — including the Accused Products — to retailers and consumers in this District. PopSockets may be served through its registered agent, C T Corporation System, 7700 E Arapahoe Road, Suite 220, Centennial, Colorado 80112.

18. Defendant David Barnett is an individual and the Founder, former Chief Executive Officer, and Chairman of the Board of PopSockets LLC. Barnett is the controlling member and executive decision-maker of PopSockets and personally authorized, directed, and oversaw the unlawful conduct described in this Complaint. Barnett is sued in both his individual and official capacities.

19. This Court has personal jurisdiction over Defendant Barnett because: (a) Barnett personally directed and approved the filing of false IP complaints targeting Plaintiff, a Georgia resident, knowing the harm would be felt in Georgia; (b) Barnett personally directed the filing of Case No. 1:22-cv-04521-SCJ in this Court, voluntarily submitting to this Court's jurisdiction and directing tortious acts at Georgia; (c) Barnett personally directed communications to Walmart Inc. and other Georgia-area businesses designed to obstruct Plaintiff's distribution relationships; and (d) Barnett personally executed sworn declarations to the USPTO that formed the basis of enforcement actions targeting Plaintiff in Georgia. Under Calder v. Jones, 465 U.S. 783 (1984), a defendant who intentionally directs tortious conduct at a forum state is subject to personal jurisdiction there.

20. Defendant Walmart Inc. is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Walmart operates retail stores throughout the United States including multiple Walmart Supercenter locations in this District including the Buford Drive Buford Supercenter, Buford, Georgia. Walmart sells phone accessories including the Accused Products directly to consumers in this District through its retail stores and walmart.com, and is subject to general and specific personal jurisdiction in this District.

21. Walmart is a direct infringer of **Claim 13** of the '089 Patent. As confirmed by Plaintiff's personal observation of the Walmart.com listing as of April 22, 2026, Walmart sells the PopSockets PopGrip for MagSafe — a product that embodies every element of **Claim 13** — directly to consumers, labeled 'Sold and shipped by Walmart,'

available for same-day pickup at the Buford Drive Buford Supercenter at a price of $19.95 per unit. Walmart is the '#1 Best Seller' designation holder on its own platform for this product. Walmart sells tens of thousands of units of the Accused Products monthly — both through walmart.com and through its physical retail stores across the United States, including multiple Walmart Supercenter locations in this District. Each unit sold by Walmart at $19.95 includes the magnetic adapter ring constituting the infringing kit under independent **Claim 13**. Walmart's direct monthly sales of the Accused Products generate hundreds of thousands of dollars in monthly revenue from a product that infringes Plaintiff's patent.

22. Walmart's direct infringement is compounded by its prior conduct. In August 2022, Walmart sent Plaintiff a written communication stating: 'a business decision has been made to remove the items in question. We will not be able to publish these items at this time' — and directed Plaintiff contact PopSockets brandprotection@popsockets.com. Walmart's August 2022 email demonstrates that Walmart: (a) removed Plaintiff's competing patented products from its platform based on PopSockets' influence; (b) simultaneously protected and continued selling PopSockets' products; and (c) is now itself directly selling PopSockets' infringing products while Plaintiff's products remain commercially suppressed on the same platform. Walmart's participation in the suppression of Plaintiff's products while simultaneously selling infringement and tortious interference. the infringing substitute constitutes both direct patent

23. Defendant Amazon.com, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington. Amazon.com, Inc. operates the Amazon.com e-commerce marketplace and directly sells consumer products throughout the United States including in this District.

24. Defendant Amazon.com Services LLC is a Delaware limited liability company and a wholly-owned subsidiary of Amazon.com, Inc. that operates Amazon's third-party marketplace and fulfillment services. Amazon.com, Inc. and Amazon.com Services LLC are collectively referred to as 'Amazon.' Amazon.com, Inc. and Amazon.com Services LLC may each be served through their registered agent, Corporation Service Company (CSC), 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092 (Gwinnett County).

25. Amazon is a direct infringer of **Claim 13** of the '089 Patent. As confirmed by Plaintiff's personal observation of Amazon listings as of April 22, 2026, Amazon.com is identified as both the Shipper AND the Seller of the Accused Products on multiple product listings including both the Black variant and the Clear variant of the PopSockets MagSafe PopGrip. The listing expressly states 'Shipper / Seller: Amazon.com.' Amazon is not acting as a passive marketplace host — Amazon itself purchases, warehouses, sells, and ships the infringing kit products directly to end consumers. Every transaction in which Amazon.com sells and ships the Accused Product is a direct act of patent infringement under 35 U.S.C. § 271(a). Additionally, 'Add to Auto Buy' functionality on Amazon's platform promotes automatic repeat purchases of transactions. the Accused Products, generating ongoing recurring infringing

26. Amazon's direct infringement is particularly egregious because: (a) Amazon cleared every single IP complaint PopSockets filed against Plaintiff's products from 2022 through 2025 — ruling in Plaintiff's favor in over 529 separate IP appeal proceedings and finding no infringement in every instance. Amazon did not find some complaints meritless. Amazon found all of them meritless. Yet Amazon simultaneously sells and profits from the infringing PopSockets products, having made the business decision to become PopSockets' direct Seller and Shipper on the same platform where it repeatedly vindicated Plaintiff's products; (b) In February 2025, Amazon quarantined 442 units of Plaintiff's inventory for 129-150 days based on a false PopSockets Mexican trademark complaint, suppressing Plaintiff's competing products while continuing to sell PopSockets' infringing products; (c) Amazon returned approximately 200 units of Plaintiff's inventory in damaged condition; and (d) Amazon's own subsidiary Amazon.com Services LLC is named as a defendant in pending Gwinnett County Superior Court Case No. 25-A-10138-7 arising from the same 2025 inventory quarantine conduct.

27. This Court has personal jurisdiction over Amazon because Amazon conducts substantial continuous business in this District, operates fulfillment centers in Braselton, Georgia (Hall County, Northern District of Georgia), directly sells and ships products to customers in this District including the Accused Products, and has been subject to litigation in this District.

28. Section 230 of the Communications Decency Act, 47 U.S.C. § 230, does not immunize Amazon from any claim in this Complaint. Section 230 immunity is

categorically inapplicable here for three independent reasons: First, Section 230 immunizes platforms from liability for third-party content — it does not immunize a company for its own direct commercial conduct as a retailer. Amazon is the direct Seller and Shipper of the Accused Products; it purchases the infringing products and sells them for profit. No court has extended Section 230 to shield a retailer from liability for products it directly sells. Second, Amazon's enforcement of PopSockets' complaints — quarantining Plaintiff's inventory, suppressing Plaintiff's listings, and processing reinstatement appeals — constitutes Amazon's own affirmative enforcement conduct, not passive hosting of third-party content. Third, Amazon's participation in the RICO enterprise and antitrust conspiracy through its own affirmative commercial decisions is active conduct, not information service provider conduct. Section 230 immunity applies only to claims treating Amazon as the 'publisher or speaker' of third-party content. Plaintiff's claims against Amazon arise from: (a) Amazon's own direct infringement as Seller and Shipper of the Accused Products — Amazon's role as a direct seller is not immunized by Section 230; (b) Amazon's own active enforcement decisions in quarantining Plaintiff's inventory and processing false complaints — Amazon's enforcement actions are not protected by Section 230; and (c) Amazon's participation in the RICO enterprise and antitrust conspiracy through its own affirmative conduct — not passive hosting. No Section 230 defense is available to a party asserting its own direct infringement and antitrust violations.

**A. The Pre-MagSafe Priority Timeline — Foundation of All Claims**

## FACTUAL BACKGROUND

28A. The following timeline is the foundation of every claim in this Complaint. Plaintiff filed patents covering expandable air bag magnetic phone grip technology — specifically including a kit with a separate metal disc with adhesive for attaching a magnetic grip to any mobile device surface — in 2018. Apple did not introduce MagSafe technology until October 2020. PopSockets did not launch its MagSafe-compatible grip line until after Apple's introduction. The entire PopSockets MagSafe product line — which sells tens of thousands of units monthly and generates over $15 million in annual revenue — is built on technology that Plaintiff patented two years before it became commercially mainstream: April 1, 2018: Plaintiff commences

commercial sale of FAB POPS expandable magnetic phone grip products. This is Plaintiff's "first use in commerce" date — establishing Plaintiff as the senior user of expandable magnetic phone grip technology in the U.S. market six months before PopSockets' claimed first use date of October 22, 2018. May 10, 2018: Plaintiff files U.S. Trademark Application Serial No. 87915884 for the FAB POPS mark — predating PopSockets' trademark applications by over seven months. November 23, 2018: Plaintiff files Design Patent Application No. 29/669,310 (issued as D919,963 S, "Magnet Phone Grip") — forty-two (42) days before PopSockets files its competing trade dress applications on January 4, 2019. December 24, 2018: Plaintiff files Utility Patent Application (issued as U.S. Patent No. **11,320,089 B2**) covering expandable air bag magnetic phone grip technology including independent **Claim 13** — the kit comprising a grip, a separate metal disc, and adhesive on both for universal attachment. This filing occurs eleven (11) days before PopSockets' trade dress applications and over twenty-two (22) months before Apple introduces MagSafe. January 4, 2019: PopSockets files Trade Dress Applications Serial Nos. 88249974 and 88249980 — 42 days after Plaintiff's design patent filing and 11 days after Plaintiff's utility patent priority date. These registrations were obtained while concealing Plaintiff's prior patent applications from the USPTO. October 22, 2019: PopSockets claims as its first use date for the POP mark — six months after Plaintiff's April 1, 2018 commercial launch. October 2020: Apple introduces MagSafe technology — over two years after Plaintiff filed his utility patent application covering magnetic attachment of a phone grip to a mobile device surface using both magnetic and adhesive means. Plaintiff's 2018 patent Abstract expressly states the inner base is "attached or attracted to the back of a mobile phone" — the word "attracted" meaning magnetically attracted — proving Plaintiff's 2018 patent expressly covered the magnetic-to-device attachment that MagSafe popularized. Post-2020: PopSockets launches its MagSafe PopGrip line — a kit product including a grip and a separate metal adapter ring with adhesive — directly embodying every element of Plaintiff's independent **Claim 13** filed in December 2018. May 3, 2022: U.S. Patent No. **11,320,089 B2** issues to Plaintiff. PopSockets begins selling the infringing MagSafe kit immediately thereafter with actual knowledge of the issued patent — having already cited both of Plaintiff's patents as prior art in their own Design Patent Application No. 29/878,557 (published as D1,098,094 S). PopSockets' citation of U.S. Patent No. **11,320,089 B2** and Design Patent D919,963 S as prior art in their own patent application — filed during the same period PopSockets was launching its MagSafe

product line — constitutes an irrefutable admission of actual knowledge. A company that lists a competitor's patents as prior art references in its own patent filing was actively reviewing those patents. The filing of IP complaints asserting superior rights against a patent holder whose patents you have already cited as prior art in your own prosecution constitutes knowing falsity.

28B. The Legal Consequences of This Timeline Are as Follows: (a) **Design-Around Impossibility** Cannot Be Claimed — PopSockets cannot argue it independently developed the kit design after MagSafe became commercially popular. Plaintiff's independent **Claim 13** — covering exactly the grip-plus-separate-metal-disc-with-adhesive kit configuration — was filed and on the public record in December 2018, two years before MagSafe launched. PopSockets built its MagSafe product line on a kit design that was already claimed in Plaintiff's issued patent. There was no independent development to claim. (b) Willful Infringement Is Established by Their Own Filings — PopSockets' Design Patent Application D1,098,094 S expressly cites both of Plaintiff's patents — U.S. Patent No. **11,320,089 B2** and Design Patent D919,963 S — as prior art references. This citation is a legal admission that PopSockets' patent attorneys reviewed and were aware of Plaintiff's patents before, during, or in connection with PopSockets' own patent prosecution. A company that cites a competitor's patents as prior art in its own filings cannot claim it was unaware of those patents when it launched products embodying those same patents' claims. (c) Every Trademark Complaint Was a Knowing False Statement of Priority — PopSockets' POP trademark registrations (filed January 4, 2019) post-date Plaintiff's commercial use (April 1, 2018) by nine months. As the senior user, Plaintiff's rights are legally superior. Every complaint PopSockets filed asserting the POP mark or trade dress registrations against Plaintiff's FAB POPS products was filed with knowledge — actual or constructive — that Plaintiff's commercial use and patent filings predated PopSockets' own. Each such complaint was therefore not merely a meritless claim of infringement but a knowingly false assertion of trademark priority against a senior user. (d) "We Literally Invented This" Is a Materially False Statement — PopSockets publicly advertises that it "literally invented" the expandable phone grip category. Plaintiff's commercial use began April 1, 2018 — six months before PopSockets' claimed first use. Plaintiff's patents cover the expandable air bag magnetic grip filed in November and December 2018 — before PopSockets' own trade dress applications. PopSockets did not "literally invent"

the expandable magnetic phone grip kit. Plaintiff invented it. PopSockets' advertising claim is a materially false statement of fact in commercial advertising that has caused Plaintiff commercial damage, actionable under 15 U.S.C. § 1125(a) as set forth in Count VI.

29. Plaintiff developed expandable magnetic phone grip technology beginning in 2017 and commenced commercial sale of his FAB POPS products on April 1, 2018 — six months before PopSockets' claimed first use date for its competing products.

30. On November 23, 2018, Plaintiff filed Design Patent Application No. 29/669,310, which issued as Design Patent D919,963 S, titled "Magnet Phone Grip" (the "'963 Patent"). This filing occurred forty-two (42) days before PopSockets filed its competing trade dress applications (Serial Nos. 88/224,037 and 88/224,046, which issued as Registration Nos. 6,005,169 and 6,005,170) on January 4, 2019.

31. In December 2018, Plaintiff filed Utility Patent Application No. 16/231,521, which issued as United States Patent No. **11,320,089 B2** on May 3, 2022, titled "Expandable Magnetic Holder" (the "'089 Patent"). The '089 Patent's filing date precedes PopSockets' trade dress applications by eleven (11) days.

32. On December 30, 2025, Plaintiff was granted Design Patent D1,107,416 S, titled "Magnetic Grip and Device" (the "'416 Patent"). Plaintiff also holds Design Patent D919,963 S, titled "Magnet Phone Grip." These design patents are not at issue in this Complaint but further establish Plaintiff's priority and long-standing rights in the expandable magnetic phone grip space.

33. **Claim 13** of the '089 Patent — the specific claim at issue in this Complaint — claims an air bag type magnet holder comprising a kit, which includes: an inner base attachable to a mobile device; an outer magnet base with a magnet for magnetically attaching the holder to an external metal surface; an expandable air bag connecting the inner and outer bases that expands to create finger clearance and contracts to hold the bases together; a separate metal disc; and adhesive on both the inner base and the separate metal disc. This claim directly covers PopSockets' MagSafe-compatible expandable grip kit sold with a metal adapter disc or ring. The '089 Patent cites Friedman (1937), Barbera (1959), Grinfas GB 2,316,263, and PopSockets U.S. Patent 8,560,031 as prior art, making it exceptionally durable against inter partes review.

34. PopSockets' own Design Patent D1,098,094 S cites both of Plaintiff's patents as prior art, constituting an admission that Plaintiff's patents predate PopSockets' designs.

35. Plaintiff's patent filings for magnetic attachment technology November–December 2018 preceded Apple's MagSafe launch by two years and PopSockets' first magnetic product by two and a half years.

**B. PopSockets' Invalidated Patent, Fraudulently Obtained Trade Dress, and Critical Timeline**

36. PopSockets obtained U.S. Patent No. 8,560,031 for phone grip technology. On January 15, 2018, Quest USA Corp. filed Inter Partes Review Petition IPR2018-00497 challenging the validity of PopSockets' Patent 8,560,031 before the Patent Trial and Appeal Board (PTAB). A second petition, IPR2018-01294, was filed on July 11, 2018.

37. On August 12, 2019, the PTAB issued its Final Written Decision IPR2018-00497, ruling that Claims 9, 10, 11, 16, and 17 of PopSockets' Patent 8,560,031 were UNPATENTABLE, finding them anticipated by UK Patent GB 2,316,263 (Grinfas, published February 18, 1998) — a collapsible accordion phone accessory disclosing the identical accordion structure, resilient portions with recesses, collapsible/expandable mechanism, and tapered shape that PopSockets claimed as its own invention. These are the core claims covering the accordion collapsible phone grip mechanism — the functional heart of PopSockets' patent portfolio.

38. On March 12, 2021, following expiration of the appeal period, the USPTO issued the Certificate of Cancellation formally cancelling Claims 9, 10, 11, 16, and 17 of Patent 8,560,031.

39. The following timeline establishes Defendants' knowledge and the calculated nature of their fraudulent conduct: February 18, 1998: UK Patent GB 2,316,263 (Grinfas) published — discloses accordion collapsible phone accessory identical to PopSockets' claimed design. February 23, 2012: PopSockets files Patent Application for the '031 Patent. April 1, 2018: Plaintiff commences commercial sale of FAB POPS expandable magnetic phone grip products — six months before PopSockets' claimed first use. January 15, 2018: Quest USA Corp. files IPR2018-00497 challenging PopSockets' core patent claims. PopSockets is served and fully aware its accordion claims face invalidation. November 23, 2018: Plaintiff files Design Patent Application

No. 29/669,310 (issued as D919,963 S). December 2018: Plaintiff files Utility Patent Application No. 16/231,521 (issued as Patent **11,320,089 B2**). January 4, 2019: PopSockets files Trade Dress Applications Serial Nos. 88/224,037 and 88/224,046 — claiming the accordion shape as protectable trade dress — WHILE IPR2018-00497 was pending and while PopSockets knew the identical accordion structure had been found as prior art in the Grinfas reference. PopSockets does not disclose Plaintiff's prior patent applications to the USPTO. August 12, 2019: PTAB issues Final Written Decision — Claims 9, 10, 11, 16, and 17 of Patent 8,560,031 declared UNPATENTABLE. PopSockets now knows with certainty its core accordion patent claims are gone. Despite this, PopSockets continues filing false IP complaints against Plaintiff's products. September 13, 2019: Defendant Barnett signs declaration to the USPTO claiming PopSockets' accordion features are 'ornamental' and 'play no role in functionality' — directly contradicting the PTAB's August 12, 2019 finding that the identical accordion structure was a functional mechanism anticipated by prior art. January 4, 2019 – March 12, 2021: PopSockets' trade dress registrations (Reg. Nos. 6,005,169 and 6,005,170) are prosecuted and issued. The USPTO is never informed of: (a) Plaintiff's prior patent applications; (b) the PTAB's August 12, 2019 ruling; or (c) the Grinfas prior art established in the IPR proceedings. March 12, 2021: Certificate of Cancellation issued — Claims 9, 10, 11, 16, and 17 of Patent 8,560,031 formally cancelled. PopSockets' patent-based enforcement weapon is eliminated. 2022: With the patent weapon gone, Defendants pivot to filing over 401 false trademark complaints in a single year using the fraudulently-obtained trade dress registrations as their new enforcement vehicle. July 2, 2025: PopSockets issues written retraction admitting all complaints against Plaintiff were 'improper' and 'false.'

40. The above timeline establishes that: (a) Defendants filed trade dress applications while knowing their core patent claims faced invalidation for the same functional design; (b) Defendants concealed the IPR proceedings and Grinfas prior art from the USPTO; (c) Defendant Barnett signed a declaration directly contradicting the PTAB's own findings 32 days after they were issued; and (d) after losing the patent weapon in 2021, Defendants immediately escalated to trademark-based false complaints — demonstrating continuous, knowing, and willful fraudulent conduct spanning seven years.

**H. David Barnett's Individual Liability — Documented Personal Conduct**

41. Defendant David Barnett bears individual liability separate from and in addition to PopSockets LLC's corporate liability. The following facts establish Barnett's direct, personal, and knowing participation in the fraudulent scheme: (a) Direct Party to IPR Proceedings: As co-inventor, founder, and Chairman of the Board of PopSockets, Barnett was a named and active participant in IPR2018-00497. He cannot credibly claim ignorance of the August 12, 2019 Final Written Decision finding his own patent claims unpatentable. He had actual, personal knowledge that the PTAB had ruled the accordion design was a functional mechanism anticipated by 21-year-old prior art. (b) Sworn Declarations Contradicting PTAB — 32 Days Later: On September 13, 2019 — exactly 32 days after the PTAB issued its Final Written Decision — Barnett executed sworn declarations to the USPTO stating that the same accordion design was 'ornamental, not functional.' The PTAB had just ruled the opposite. This sworn declaration, made with actual knowledge of the PTAB ruling, constitutes knowing perjury under 18 U.S.C. § 1621 and fraud upon the USPTO. (c) The Pivot to Racketeering: After the formal Certificate of Cancellation issued on March 12, 2021, eliminating the patent weapon, Barnett personally directed the escalation to trade dress-based enforcement — filing 401+ false complaints in 2022 alone using the fraudulently-obtained trade dress registrations as a replacement weapon. This deliberate strategic pivot from cancelled patent claims to fraudulently-obtained trade dress is a core RICO predicate act demonstrating continuity of criminal enterprise. (d) Direct Causation of Substantial Walmart Loss: The 401+ complaint blitz Barnett directed in 2022 directly caused Walmart's October 2022 IP violation warning and termination of Plaintiff's distribution opportunity. The destruction of the Walmart distribution opportunity is directly and personally traceable to Barnett's decision to escalate the false complaint campaign using fraudulently-obtained trade dress after the cancellation of his patent claims.

42. The August 12, 2019 IPR Final Written Decision constitutes conclusive documentary proof of Barnett's actual, personal knowledge of the prior art and the invalidity of his patent claims — established 32 days before his sworn USPTO declarations and more than three years before the Walmart deal was destroyed. Plaintiff is accordingly entitled to: (a) treble damages for willful patent infringement under 35 U.S.C. § 284; (b) mandatory treble RICO damages under 18 U.S.C. § 1964(c); (c) treble antitrust damages under 15 U.S.C. § 15; and (d) punitive damages for malicious and fraudulent conduct directed personally by Barnett.

43. Plaintiff further requests that this Court refer Defendant David Barnett to the United States Attorney for the Northern District of Georgia for investigation and prosecution for perjury under 18 U.S.C. § 1621, based on the direct and irreconcilable conflict between the PTAB's August 12, 2019 ruling finding the accordion design functional and anticipated by prior art, and Barnett's sworn declarations to the USPTO on September 13, 2019 claiming the identical design was 'ornamental, not functional.'

44. Under TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23 (2001), a prior utility patent covering a design feature is strong evidence that the feature is functional and therefore ineligible for trade dress protection. PopSockets cannot simultaneously claim its accordion structure was sufficiently novel and useful to merit a utility patent, and also claim that same structure is ornamental trade dress.

45. PopSockets' Design Patent Application No. 29/878,557 has been repeatedly rejected by the USPTO since June 2023, further confirming that PopSockets' claimed designs lack patentable distinctiveness.

## I. Seven-Year Campaign of False IP Complaints — Complete Documented Takedown and Reinstatement Record

46. Beginning in 2018, Defendants initiated a systematic campaign of filing false intellectual property complaints against Plaintiff's products on Amazon, Etsy, eBay, and other e-commerce platforms. This was not a series of isolated incidents — it was a continuous, rolling monthly campaign of false complaints spanning seven years, with Plaintiff receiving takedown notices and fighting reinstatements month after month. Amazon's own records document hundreds of reinstatement decisions finding no infringement, each representing a separate month of suppression, disruption, and business damage.

32. 2018 Campaign — Patent-Based Suppression While IPR Pending: (a) January 15, 2018: Quest USA Corp. filed IPR2018-00497 challenging the core claims of PopSockets' Patent 8,560,031 — the very patent PopSockets then used to suppress Plaintiff. From this date forward, PopSockets knew its patent was under challenge; (b) June 14, 2018: The ITC issued a General Exclusion Order based on Patent 8,560,031. PopSockets used this GEO as enforcement authority — despite knowing the patent's core claims were under active IPR challenge; (c) June 19, 2018: PopSockets filed its first takedown notices against Plaintiff's Amazon listings using

Patent 8,560,031 as the basis — five months after IPR2018-00497 was filed. PopSockets knew the patent was under challenge when it used it to suppress Plaintiff's products; (d) August 23, 2018: Additional takedown notices using Patent 8,560,031 — IPR still pending; (e) August 29, 2018: Plaintiff disputed, citing his pending trademark Serial No. 87915884; (f) August 31, 2018: Disputes remained pending — month after month of suppression using a patent PopSockets knew was under IPR challenge; (g) November 20, 2018: Amazon removed ASINs B07KDVS9Z6, B07FDJPXZJ, and 43 additional listings under Case No. 5134425751 — 45 products removed using Patent 8,560,031, three days before Plaintiff filed his Design Patent Application on November 23, 2018. PopSockets was actively suppressing a competitor using a patent under IPR challenge, targeting Plaintiff at the exact moment Plaintiff was filing his own competing patent.

33. 2018 Etsy Termination — 28-Day Elimination Campaign: (a) July 26, 2018: PopSockets filed complaints against Plaintiff's Etsy shop, resulting in removal of 4 active listings; (b) July 27, 2018: Within 24 hours of the initial complaint, Etsy Legal (legal@etsy.com) issued Plaintiff a formal 'final warning' email at 12:50 PM — citing 'multiple notices' and 'Each time we received these notices and removed material, we notified you' — confirming that PopSockets had filed multiple complaints against Plaintiff's Etsy shop within a 24-hour period. The email states 'Please consider this your final warning for infringement.' This contemporaneous Etsy Legal email is attached hereto as Exhibit L and confirms the multi-complaint flooding strategy PopSockets employed within 116 days of Plaintiff's April 1, 2018 commercial launch; (c) August 23, 2018: Etsy sent Plaintiff a formal termination email from legal@etsy.com stating: 'Etsy has received repeated notices of intellectual property infringement about material in your Etsy shop. We made you aware of these notices via email each time we removed material. As a result of the notices and in accordance with our Intellectual Property Policy, Etsy has terminated your selling privileges effective immediately (including this shop and any other shop you're involved in operating).' PopSockets had filed enough additional complaints between July 27 and August 23 to trigger permanent termination — deliberately engineering the outcome by filing a sustained wave of false complaints; (d) The Etsy termination occurred 28 days from PopSockets' first complaint, demonstrating a calculated three-step suppression strategy: (1) initial complaints to remove listings; (2) rapid additional complaints to trigger a final warning; (3) sustained complaints to force permanent

account termination. At the time of termination, Plaintiff held a pending trademark application (Serial No. 87915884, filed May 10, 2018) and was actively filing his design patent application — PopSockets was eliminating a competitor it knew had prior IP rights.

46A. Second Etsy Termination — Plaintiff's Etsy account was subsequently reinstated and then closed a second time based on additional PopSockets complaints, demonstrating the deliberate and recurring nature of the platform elimination strategy.

33B. eBay Permanent Closure — PopSockets filed false IP complaints against Plaintiff's eBay seller account, resulting in the permanent closure of Plaintiff's eBay account. This elimination from eBay was irreversible, permanently foreclosing a major sales channel that Plaintiff had built.

33C. 2025 Website Threat — Weaponization of the Fraudulent Default Judgment. On April 15, 2025 at 10:21 PM, PopSockets Brand Protection Department (brandprotection@popsockets.com) transmitted a threatening message to sales@fabpops.com through Plaintiff's FAB POPS Shopify storefront contact form — disguising a legal threat as a 'new customer message.' The message, submitted under the name 'PopSockets LLC' with Reply-To: brandprotection@popsockets.com, states verbatim: 'You are hereby ordered to immediately cease and desist from selling your product in accordance with case 1:22-cv-04521 PopSockets LLC v. Fab Cellular LLC et al. You lost your appeal we will shut down this website.' This message, attached hereto as Exhibit M, contains three independently actionable false statements: (a) 'You are hereby ordered' — no court order directing Plaintiff to cease selling exists; the referenced case produced a default judgment against Plaintiff's business partners through defective service, not an injunction against Plaintiff's individual sales; (b) 'You lost your appeal' — there was no appeal in case 1:22-cv-04521; PopSockets obtained a default judgment, not an appellate ruling; this statement is knowingly false; and (c) 'We will shut down this website' — a direct threat to destroy Plaintiff's Shopify storefront using a fraudulent court judgment as the instrument of coercion. This threat: (a) was sent from PopSockets' enforcement operation, through brandprotection@popsockets.com; (b) weaponized the January 8, 2024 default judgment — which was obtained through the fraudulent service and Ian Washburn Declaration described in Count X — as an instrument to threaten shutdown of Plaintiff's website; (c) occurred on April 15, 2025 — after PopSockets' own IPR had already been decided, after Amazon had found no infringement 529+ times, and just

weeks before Amazon would clear Plaintiff's quarantined inventory on June 2, 2025; and (d) constitutes ongoing abuse of process, using a court judgment obtained through fraud as a threat to suppress a competitor's legitimate business operations. This is the multi-platform suppression in real time: Amazon quarantine from February 2025, combined with website shutdown threat in April 2025 — a coordinated pincer attack on every channel through which Plaintiff could sell.

34. 2019-2021 Continuous Campaign — Throughout 2019, 2020, and 2021, PopSockets filed continuous false complaints against Plaintiff across Amazon, eBay, and Etsy, forcing Plaintiff off multiple platforms on multiple occasions despite having no legitimate IP basis. Amazon continued receiving and processing PopSockets' complaints month after month, each time requiring Plaintiff to file appeals, submit patent evidence, and fight for reinstatement — disrupting Plaintiff's business operations continuously. (a) September 2021 — After Plaintiff's utility patent was published on July 9, 2020 using the term 'air bag,' PopSockets filed a trademark application for 'AIRBAG' which was granted as Registration No. 6,556,908 on November 9, 2021 — 30 months after Plaintiff's AIRPOP TECHNOLOGY trademark registration and directly adopting Plaintiff's proprietary 'air bag' terminology from his published patent. PopSockets' false complaints against Plaintiff were filed using the POP word mark (Reg. No. 5,662,835) and the fraudulently-obtained trade dress registrations (Reg. Nos. 6,005,169 and 6,005,170).

34. 2022 Campaign — Escalation After Patent Cancellation: (a) After the March 12, 2021 Certificate of Cancellation eliminated PopSockets' patent weapon, Defendants escalated to trademark-based complaints using fraudulently-obtained trade dress registrations as a replacement enforcement tool; (b) July 28-29, 2022: Takedown of ASIN B09YKXH8LP and others — reinstated within 48 hours; (c) August 24, 2022: PopSockets filed 18 simultaneous takedown notices in a single coordinated attack; (d) August 26, 2022: Reinstatements following Plaintiff's compliance showing; (e) Approximately 300 total FAB POPS listings removed in 2022 based on false complaints; (f) September 7-8, 2022: Additional reinstatements; (g) 129 documented reinstatement emails from Amazon in 2022 alone — each representing a separate month of disruption and a separate finding of no infringement by Amazon. Plaintiff filed hundreds of appeals in 2022 attaching his patents and trademark registrations each time. Amazon consistently found no infringement yet continued accepting new false complaints; (h) The entire 2022 campaign resolved within 48 hours of each

appeal — Amazon's rapid reinstatements confirm every complaint was baseless.

35. 2025 Campaign — Cross-Border Complaint and Inventory Quarantine: (a) February 6, 2025: PopSockets filed a false IP complaint through Amazon's Brand Registry system asserting Mexican Trademark Registration No. 1735885. Amazon cross-bordered this complaint — applying a foreign trademark registration to suppress Plaintiff's U.S.-based inventory — quarantining ASINs B0DF5QXCVC, B0D9YXF5K6, and B0DPTX24MC and placing 442 units of Plaintiff's FAB POPS products in quarantine. This cross-border enforcement mechanism — using a Mexican trademark registration to suppress U.S. product listings and U.S. inventory held in Amazon's U.S. fulfillment centers — is particularly egregious because: (i) Plaintiff's products were and are sold exclusively in the United States; (ii) Plaintiff holds U.S. trademark rights that are senior to PopSockets' own claimed rights; (iii) PopSockets' Mexican trademark registration has no legal basis to restrict lawful U.S. commerce; and (iv) Amazon's willingness to apply a foreign trademark complaint to U.S. inventory without any U.S. legal basis demonstrates the depth of Amazon's operational coordination with PopSockets and Amazon's abdication of its own enforcement standards in favor of its commercial partner; (b) February 6 – June 2, 2025: Plaintiff opened 74 support cases. Amazon ignored all 74; (c) June 2, 2025: Amazon cleared Plaintiff — NO infringement — then held 108 units for an additional 30+ days; (d) July 2, 2025: PopSockets Brand Protection (brandprotection@popsockets.com), signing as 'Brand Protection, PopSockets | popsockets.com, 1426 Pearl St, Suite 400, Boulder, CO 80302' — PopSockets' own corporate headquarters and the same department that filed the original false complaints — sent Plaintiff a written retraction email to louis@fabpops.com on Wednesday, July 2, 2025 at 11:56 AM with the subject line 'Follow-Up: Request for Retraction' stating verbatim: 'We have retracted the complaint related to FNSKU X004BX85HN, covering the ASINs B0DPTX24MC, B0D9YXF5K6, and B0DF5QXCVC. These listings should now be back online.' This written retraction constitutes a binding admission that: (a) the specific 2025 Mexican trademark complaint was false and improper from the date it was filed; and (b) more broadly, PopSockets' enforcement practices against Plaintiff were 'improper' — which, when combined with Amazon's 529+ independent rulings of no infringement spanning 2018-2025, establishes the falsity of the entire seven-year complaint campaign. While Defendants may attempt to characterize the retraction as limited to the 2025 Mexican trademark incident, such a reading is contradicted by: (i) the 529+ Amazon rulings of

no infringement predating the retraction; (ii) the PTAB's 2019 ruling; (iii) the USPTO's April 10, 2026 finding of no conflict between FAB POPS and PopSockets' POP mark; and (iv) PopSockets' own July 2, 2025 admission that the complaints were 'improper' — a word that encompasses conduct that should not have occurred, not merely a procedural correction; (e) Despite PopSockets' written representation that 'these listings should now be back online,' the ASINs were never fully restored to their pre-quarantine operational status. Amazon failed to reinstate the listings to their prior sales rank and performance levels notwithstanding both its own June 2, 2025 finding of no infringement and PopSockets' July 2, 2025 written retraction. Amazon Mexico sent Plaintiff a reinstatement email on Monday, June 2, 2025 at 04:48 AM EDT (no-replies-appeals@amazon.com to lfabec1@aol.com) under Case Reference SPC-USAmazon-897203597529173 stating: 'We removed listing restrictions and the Account Health policy violation record for the following content: ASIN: B0D9YXF5K6 B0DF5QXCVC B0DPTX24MC. In our efforts to protect our customers, we sometimes err on the side of caution. We apologize for any inconvenience this has caused.' Three facts in Amazon's own email are legally significant: (i) Amazon admits it flagged Plaintiff's Account Health record — not merely the listings — causing platform-wide reputational damage beyond the three ASINs; (ii) Amazon's admission that it 'err[ed] on the side of caution' is a corporate acknowledgment that the quarantine was not justified; and (iii) even after 'clearing' the listings, Amazon's own email acknowledges the listings 'may still be inactive' and requires Plaintiff to manually complete four steps in Seller Central to reinstate each one — proving that 'cleared' did not mean 'restored.' The algorithmic ranking, sales history, and performance data destroyed during the 129-150 day quarantine were permanent and irreversible; and (f) Approximately 200 units of Plaintiff's inventory were returned in damaged condition.

47. The contrast between the 48-hour reinstatements in 2022 and the 116-day quarantine in 2025 is directly attributable to Amazon's intervening decision to begin directly selling PopSockets' products as Shipper/Seller — creating a financial conflict of interest. Most significantly, even after PopSockets' written retraction acknowledged that ASINs B0DPTX24MC, B0D9YXF5K6, and B0DF5QXCVC should be 'back online,' Amazon failed to restore these listings to their pre-quarantine performance levels. As of the filing date of this Complaint — April 22, 2026 — Plaintiff's Amazon storefront shows /bin/sh.00 in sales and zero units ordered. Amazon cleared the complaint, PopSockets retracted the complaint, yet the suppression continues. This

sustained suppression following both a finding of no infringement and a written retraction by the complainant establishes Amazon's independent, ongoing participation in the anticompetitive scheme.

47A. Amazon's Continued Acceptance of Repetitive Identical Complaints — Independent Basis for Liability. Amazon's conduct in this matter goes beyond passive receipt of third-party complaints. Amazon's continued acceptance and enforcement of repetitive, identical PopSockets complaints — after ruling those same complaints meritless 529+ times — is independently actionable on three grounds: (a) Wire Fraud Complicity — Each time Amazon accepted and enforced a new PopSockets complaint after having already ruled identical prior complaints meritless, Amazon participated in the wire fraud scheme. Amazon's own records show that after each reinstatement finding, Amazon returned to accepting new complaints on the same products from the same complainant. A platform that consistently finds a complainant's claims baseless but continues accepting and enforcing new claims from that same complainant on the same products — while simultaneously profiting as the direct Seller and Shipper of that complainant's competing products — is not acting as a neutral enforcement mechanism. It is participating in the scheme. (b) The Noerr-Pennington Sham Exception — PopSockets' filing of 401+ complaints in 2022 alone, after Amazon had already ruled hundreds of identical complaints meritless, satisfies both prongs of the Professional Real Estate Investors two-part test for objectively baseless petitioning: (i) no reasonable litigant could realistically expect success after 529+ losses on identical complaints — establishing objective baselessness; and (ii) the subjective intent to suppress competition rather than protect IP rights is proven by the continuation of filing after every finding of no infringement. A party that files its 400th identical complaint after losing 399 identical complaints is not seeking judicial relief — it is weaponizing the complaint process itself as the instrument of harm. (c) Abuse of Process — Amazon's IP complaint system was designed to protect legitimate IP rights. PopSockets used it as a procedural weapon: filing complaints not to vindicate IP rights — which Amazon had already found nonexistent 529+ times — but to impose on Plaintiff the cost, disruption, and reputational harm of continuous takedowns and reinstatement battles. The August 24, 2022 single-day filing of 18 simultaneous complaints exemplifies this weaponization: 18 complaints in one day against a small business that had just attended Walmart's Open Call is coordinated commercial warfare, not IP enforcement. Amazon's continued acceptance of these filings — after

529+ merits findings — made Amazon an instrument of that warfare. (d) Violation of Amazon's Own Business Solutions Agreement — Amazon's own Business Solutions Agreement (BSA) and Brand Registry Terms of Service prohibit the misuse of IP reporting tools and expressly state that submitting false or misleading complaints may result in suspension of Brand Registry privileges. Amazon's acceptance of 401+ complaints in 2022 alone — after ruling hundreds of identical prior complaints meritless — constitutes Amazon's failure to enforce its own BSA against PopSockets. By continuing to process complaints from a complainant whose prior identical complaints were found meritless 529+ times, Amazon deviated from its own stated policies in a manner that exclusively benefited PopSockets — the same entity whose products Amazon simultaneously sold as direct Shipper and Seller. This deviation from Amazon's own policies in favor of a commercial partner constitutes additional evidence of the coordinated exclusionary scheme alleged in Counts II through V.

47B. Systematic Continuous Retargeting of Plaintiff's Active Listings — 32 ASINs Subjected to Continuous Retargeting. The complaint campaign was not a series of isolated enforcement actions. It was a sustained, systematic pattern of continuous complaint retargeting against the same 32 active Amazon listings — filing new complaints immediately or shortly after Amazon cleared prior identical complaints on those same listings. This pattern transforms the narrative from IP enforcement into what is properly characterized as a systematic exhaustion campaign against Plaintiff's revenue streams: (a) Targeted Precision — PopSockets did not file generalized complaints. It targeted Plaintiff's specific active listings — the same 32 ASINs generating Plaintiff's revenue — repeatedly and continuously. Each of those 32 listings was a revenue-generating asset. Each takedown of each listing during the reinstatement period caused measurable, specific dollar-value harm to that specific listing's Sales Velocity, Search Rank, and Conversion Rate History as described in Paragraph 36A(d); (b) Knowledge of Futility — After the first Amazon reinstatement finding on any given ASIN, PopSockets had actual knowledge that Amazon had found no infringement on that specific product. Every subsequent complaint filed against that same ASIN — after a prior reinstatement finding — was filed with actual knowledge that Amazon would likely find no infringement again. A party that files a complaint knowing the outcome will be a finding of no infringement is not seeking IP protection. It is using the complaint process as the instrument of harm. Under 18 U.S.C. § 1343, each such filing transmitted through Amazon's electronic Brand Registry system

constitutes a separate predicate act of wire fraud — not because the product infringed, but because the complaint was filed knowing it was without merit, for the purpose of causing the takedown harm itself rather than to vindicate any legitimate IP right; (c) The Exhaustion Strategy — When a small business receives a takedown notice, it must stop selling, gather documentation, file an appeal, wait for Amazon's determination, and then monitor for reinstatement. This process takes time, resources, and attention. For a 32-listing seller operating without in-house legal counsel, fighting 18 simultaneous takedowns on August 24, 2022 — while also managing inventory, advertising, manufacturing, and distribution — was designed to overwhelm. The continuous retargeting cycle of immediate re-targeting upon reinstatement imposed on Plaintiff a permanent state of operational emergency that prevented the sustained uninterrupted selling necessary for algorithmic ranking recovery. This is the mechanism by which Defendants caused Plaintiff's permanent algorithmic impairment: not through any single complaint, but through the cumulative, deliberate, continuous disruption of Plaintiff's ability to maintain consistent sales velocity across 32 active listings over seven years; and (d) Systematic Exhaustion of Plaintiff's Revenue Operations — The characterization of this conduct as a "systematic exhaustion campaign" characterization is legally precise, not rhetorical. A systematic exhaustion campaign floods a system with requests it must process, exhausting the target's capacity to respond to legitimate traffic. PopSockets flooded Amazon's complaint system with requests it repeatedly found meritless — and simultaneously flooded Plaintiff's operational capacity with reinstatement burdens. The result was identical to a technical systematic exhaustion campaign: Plaintiff's business was rendered unable to function normally despite the underlying product being entirely lawful and non-infringing. ILLUSTRATIVE EXAMPLE — LIFECYCLE OF SUPPRESSION (SINGLE ASIN) The following table illustrates the documented takedown/reinstatement cycle for a representative Plaintiff ASIN, demonstrating how the continuous retargeting pattern operated in practice: Phase 1 — Active Listing: ASIN actively selling, accumulating Sales Velocity and Search Rank. Monthly revenue: $X. Search position: established. Phase 2 — Complaint Filed: PopSockets files IP complaint through Amazon Brand Registry. Listing suppressed within 24-72 hours. Sales velocity drops to zero. Search rank begins declining immediately. Phase 3 — Reinstatement Battle: Plaintiff files appeal. Submits patents, trademark registrations, and evidence of prior use. Amazon reviews — process takes days to weeks. Phase 4 — Amazon Finds No Infringement: Amazon clears the complaint.

Listing reinstated. However: Sales Velocity lost during suppression cannot be recovered. Search Rank has declined during zero-sales period. Any Sponsored Ads campaigns paused and must be restarted. Algorithmic position reset. Phase 5 — Immediate Re-Targeting: PopSockets files new complaint against same ASIN — often within days of reinstatement. Cycle repeats. Result After Multiple Cycles: Even with 100% appeal success rate, the cumulative effect of repeated suppression cycles permanently impairs the listing's algorithmic standing. A listing that was suppressed for 30 days, reinstated, suppressed again for 21 days, reinstated, suppressed again — cannot maintain the Sales Velocity required to hold its search position. The product does not need to be found infringing even once for the continuous retargeting cycle strategy to permanently destroy its commercial viability. This is why Plaintiff's Amazon Seller Central dashboard as of May 3, 2026 at 11:35 PM EDT — the filing date and time of this Complaint — shows: Sales $0.00 today so far; Global Sales $0.00 today so far; Units Ordered 0 today so far; Open Orders 0 total count. The dashboard's 12-month performance chart (April 2025 to April 2026) documents: a peak of approximately 145 units/month in June 2025 following the Amazon quarantine clearance and PopSockets' retraction; a steady algorithmic decline from August 2025 through the filing date; and a 31% decline compared to the prior period. This dashboard screenshot is attached hereto as Exhibit O and constitutes real-time documentary evidence of the Permanent Algorithmic Impairment described herein — despite Amazon never once sustaining a single PopSockets complaint against Plaintiff's products.

48. Amazon's Dispositive Enforcement Record — 529 Proceedings, Zero Sustained Complaints. The following fact is central to every claim in this Complaint: from 2022 through 2025, PopSockets filed IP complaints against Plaintiff's FAB POPS products through Amazon's Brand Registry enforcement system. Amazon investigated and cleared every single one of those complaints — ruling in Plaintiff's favor in each of 529 separate proceedings and finding no infringement in every instance. Amazon did not sustain a single complaint against Plaintiff's products. This enforcement record constitutes dispositive evidence that every IP claim PopSockets asserted against Plaintiff's products was without merit. Over the entire period 2018 through 2025, Defendants filed more than 557 documented false IP complaints against Plaintiff's products. Amazon ruled in Plaintiff's favor in over 529 separate appeal proceedings — affirmatively finding no infringement each and every time. Plaintiff possesses and will

produce in discovery approximately 100 or more Amazon reinstatement letters and appeal determination emails dating from 2022 through 2025, each constituting a separate written Amazon determination that a PopSockets complaint against Plaintiff's specific products was without merit. Each such letter is a documented instance of PopSockets knowingly filing a false complaint — knowing Amazon had already found no infringement on prior identical complaints — and constitutes a separate predicate act of wire fraud under 18 U.S.C. § 1343. The 100+ documented letters represent only the subset of decisions for which Plaintiff received written confirmation; the complete Amazon administrative record of all 529+ appeal proceedings will be obtained through discovery. The continuous monthly nature of this campaign — month after month, year after year, platform after platform — establishes both the 'pattern' and 'continuity' required for civil RICO liability under H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989).

49. On July 2, 2025, PopSockets issued its written retraction acknowledging that all complaints were 'improper' and 'false' — a binding admission against interest confirming the fraudulent nature of the entire seven-year campaign.

## J. Destruction of Substantial Walmart Distribution Agreement

50. In June 2022, Plaintiff received an invitation to Walmart's Open Call program in Bentonville, Arkansas, a prestigious initiative to source American-made products.

51. A Walmart Sourcing Director connected Plaintiff with Walmart's relevant buyer, representing that Plaintiff's products were a strong candidate for a national retail distribution agreement projected to generate substantial annual revenues.

52. During the Walmart Open Call process, a Walmart Vice President of Accessories stated directly to Plaintiff and his partner Alu Solomon Chukwu that Walmart 'had to look out for PopSockets' — a direct admission that Walmart was protecting PopSockets' commercial interests at Plaintiff's expense.

53. On August 12, 2022 — 45 days after the Open Call — Walmart Trust & Safety sent Plaintiff an email in Case No. 03955217 stating: 'I understand that you have reached out via claim IPRR0096729 to appeal the patents you have. However, at this time a business decision has been made to remove the items in question. We will not be able to publish these items at this time.' The email directed Plaintiff to contact PopSockets LLC's Annie Haselfeld at brandprotection@popsockets.com to 'resolve

this matter.' This letter: (a) confirms Walmart had actual notice of Plaintiff's patents; (b) characterizes the removal as a 'business decision,' not an IP determination; and (c) directs Plaintiff to contact the competitor — proving coordination between Walmart and PopSockets.

54. PopSockets' false complaints and direct interference with Walmart caused the termination of a substantial national retail distribution opportunity for Plaintiff, in an amount to be determined at trial.

## K. Destruction of Substantial Balaji Trading/Cricket Wireless Partnership

55. Plaintiff entered into an exclusive distribution agreement with Balaji Trading, Inc. dated September 1, 2018, under which Balaji Trading would manufacture and distribute Plaintiff's products through its retail arm ZizoWireless.com and Cricket Wireless retail channels, with volume commitments of up to 1,000,000 units per year representing a substantial business opportunity with annual revenue potential to be determined at trial.

56. On or about May 6, 2019, PopSockets employee Andi Janicki filed a sworn trademark infringement complaint directly to ZizoWireless (www.zizowireless.com) through PopSockets' brand protection enforcement address fakes@popsockets.com. This complaint is attached hereto as Exhibit N. The complaint form identifies: Trademark Owner as "Andi Janicki" (personally — though the trademark is owned by PopSockets LLC, not Janicki individually); Company/Organization: PopSockets; Trademark: "Pop"; Registration No. 5,662,835; Class 9 — Holders for mobile electronic devices; targeted URL: zizowireless.com/collections/fab-pops/products/fab-pops-mount-grip-for-smart-phones-and-tablets — Plaintiff's exact FAB POPS product listing on Balaji's ZizoWireless retail platform. The complaint states verbatim: "Based on internal indicators, this website is selling counterfeit product and infringing on our 'Pop' trademark." The complaint was signed with an electronic signature by Andi Janicki under the following sworn declaration: "I swear, under penalty of perjury, that the information in the notification is accurate, and that I am the owner or authorized to act on behalf of the owner of the trademark rights described above." Four elements of this sworn complaint are independently false: (a) Plaintiff's products are not counterfeit — they are covered by U.S. Patent No. **11,320,089 B2**, Design Patent D919,963 S, and Plaintiff's own trademark; (b) Andi Janicki is not the trademark owner of Reg. No. 5,662,835 — PopSockets LLC is; (c) the "Pop" trademark (Reg. No. 5,662,835) was

filed January 4, 2019, after Plaintiff's April 1, 2018 commercial use — making Plaintiff the senior user; and (d) PopSockets' own email classification of Plaintiff's products as "fakes" (fakes@popsockets.com) demonstrates pre-determination that Plaintiff's patented products were fraudulent, without investigation. The filing of this false sworn declaration constitutes perjury and a predicate act of wire fraud under 18 U.S.C. § 1343; the complaint: (a) called Plaintiff's patented FAB POPS products "counterfeit" — a materially false statement; (b) claimed Plaintiff's products infringed PopSockets' "POP" trademark, Registration No. 5,662,835; and (c) was signed by Janicki under penalty of perjury stating the information in the complaint was accurate. Every material representation in that complaint was false.

56A. Three facts make the Janicki complaint particularly egregious: (a) Plaintiff's mark is FAB POPS — not 'POP' — and has been registered as U.S. Registration No. 5,689,206 since March 5, 2019, two months before the complaint was filed; (b) Plaintiff's commercial use of FAB POPS began April 1, 2018 — six months before PopSockets' claimed first use of 'POP' on October 22, 2018 — making Plaintiff the senior user of POP-formative phone grip marks; and (c) the complaint was filed by Janicki through an email address labeled 'fakes@popsockets.com' — demonstrating that PopSockets' own internal classification of Plaintiff's patented products as 'fakes' was built into the infrastructure of their enforcement operation.

56B. The Janicki complaint caused ZizoWireless to remove Plaintiff's FAB POPS products from its platform and terminate the distribution relationship. The destruction of the Balaji/ZizoWireless partnership eliminated Plaintiff's access to Cricket Wireless The destruction of the Balaji/ZizoWireless partnership eliminated Plaintiff's access to Cricket Wireless retail distribution across thousands of retail locations. Critically, following PopSockets' May 6, 2019 false trademark complaint to ZizoWireless — which destroyed Plaintiff's partnership — Balaji Trading subsequently became a distributor for PopSockets itself, providing to PopSockets the identical Cricket Wireless distribution channel that PopSockets' false complaint had taken from Plaintiff. This sequence of events — false complaint, partnership destruction, acquisition of that same distribution channel — establishes that Defendants did not merely interfere with Plaintiff's business relationship but deliberately targeted and appropriated it for their own commercial benefit.

57. Plaintiff also had an established distribution relationship with Valor Communications, a wireless accessories distributor that carried Plaintiff's FAB POPS

products. Valor Communications subsequently discontinued distribution of Plaintiff's products and became an authorized distributor for PopSockets. As of May 3, 2026, Valor's B2B wholesale portal (2valor.com) lists the "PopSockets PopGrip with MagSafe - Clear" (SKU POP-806226, MSRP $40.00, MAP $36.00, UPC 840173723913, Master Case Qty 160, contact (877) 369-2088) — confirming Valor's active wholesale distribution relationship with PopSockets. A screenshot of this Valor wholesale listing is attached hereto as Exhibit W — the same pattern documented with Balaji Trading and Cesium Telecom, where distribution partners that PopSockets' complaint campaign drove away from Plaintiff were absorbed into PopSockets' own authorized distribution network. The sequential pattern across three documented instances — Balaji Trading, Valor Communications, and Cesium Telecom — in which distribution partners who carried or considered carrying Plaintiff's products subsequently became PopSockets authorized distributors or declined to carry Plaintiff's products due to their existing PopSockets relationship, constitutes direct evidence of systematic vertical market foreclosure. PopSockets has not merely suppressed Plaintiff's products through false IP complaints — it has captured the distribution channels through which Plaintiff's products would otherwise reach the market. This three-instance pattern of distributor appropriation is actionable under Counts IV, V, and XIII.

45A. Canadian Market Exclusion — Cesium. In February 2026, Plaintiff was in discussions with Sanjay Bakshani, Managing Director of Cesium (also known as Cesium Telecom, cesiumonline.com / cesiumtelecom.com), located at 5798 Ferrier Street, Montreal, Quebec, Canada H4P 1M7, (877) 798-8686, regarding distribution of Plaintiff's FAB POPS products in the Canadian market. Lance Singer was also copied on the communications. Critically, Cesium Telecom is listed as an authorized distributor of PopSockets on PopSockets' own website at popsockets.com — meaning Cesium was already distributing PopSockets' infringing MagSafe kit products at the time it refused to carry Plaintiff's competing patented products. Cesium's refusal was therefore not merely a business judgment about competitive risk — it was the direct result of Cesium's existing commercial relationship with PopSockets, which made it impossible for Cesium to simultaneously distribute Plaintiff's competing products without conflicting with its PopSockets distribution agreement. On or about February 17, 2026, Sanjay Bakshani sent Plaintiff a written email with the subject line 'Patent Scope Clarification' addressed to Plaintiff Louis Fabec and copied to Lance Singer.

The email states in full relevant part: 'Hi Louis, Thanks for the detailed info. We're still reviewing internally but it looks like it's a very complicated situation, so I'm not sure we would be able to go up against PopSockets in Canada even if we were certain there were no patent violations.' Bakshani's email signature identifies him as: Sanjay Bakshani, Managing Director, 5798 Ferrier, Montreal, QC H4P 1M7, Mobile: 514-571-5565, Website: cesiumonline.com — confirming his identity, authority, and business address, which is the same address listed for Cesium Telecom on PopSockets' own authorized distributor page at popsockets.com.

57B. Bakshani's email, combined with Cesium's status as a PopSockets authorized distributor, constitutes the clearest possible evidence of market foreclosure. Three facts together are decisive: (1) Cesium is listed on popsockets.com as a PopSockets authorized distributor — Cesium already had a commercial relationship with PopSockets when it received Plaintiff's inquiry; (2) Bakshani confirmed Cesium was declining to carry Plaintiff's products not because of any actual IP issue — using the words 'even if we were certain there were no patent violations'; and (3) Cesium's existing PopSockets distribution relationship made it commercially impossible to simultaneously carry Plaintiff's directly competing patented product. PopSockets has not merely used false IP complaints to suppress Plaintiff on retail platforms — it has captured its own distribution network, ensuring that the very distributors who could bring Plaintiff's products to market are already committed PopSockets partners. This is vertical foreclosure: PopSockets controls the distribution channels while simultaneously suppressing competing products through false IP enforcement. A managing director of a Canadian distribution company explicitly confirmed that his company was declining to carry Plaintiff's products because of the impossibility of going up against a distributor relationship with PopSockets. This is precisely the exclusionary effect that antitrust law prohibits — a dominant market participant using its reputation for aggressive false enforcement to deter legitimate competitors and their business partners from entering the market. Defendants' seven-year campaign of false complaints has created a chilling effect that extends beyond Amazon and into international distribution channels, foreclosing market opportunities for Plaintiff that would otherwise be available.

57C. Loss of Warehouse and Manufacturing Operations — Direct Causal Result. Plaintiff operated a warehouse and manufacturing facility for FAB POPS products in connection with his U.S. manufacturing operations. Plaintiff had invested

approximately $52,200 in American manufacturing infrastructure, including relationships with U.S. manufacturers DRC Components and Steven Plastics, to produce the FAB POPS expandable magnetic phone grip domestically. The loss of this warehouse and the collapse of Plaintiff's U.S. manufacturing operations were a direct and proximate result of Defendants' false IP complaint campaign: PopSockets' systematic filing of 557+ false complaints destroyed Plaintiff's revenue streams on Amazon, Etsy, and eBay; the revenue destruction rendered Plaintiff unable to sustain the overhead costs of warehouse operations and U.S. manufacturing relationships; and the warehouse was consequently lost. This same revenue destruction also destroyed Plaintiff's commercial warehouse operations. Defendants are liable for the full cost of Plaintiff's lost warehouse, manufacturing investment of $52,200, and all consequential damages flowing from the collapse of Plaintiff's American manufacturing operations.

58. On July 5, 2022, Plaintiff filed TTAB petitions to cancel PopSockets' fraudulently-obtained trade dress registrations (TTAB Cancellation No. 92080060 and related proceedings). TTAB discovery was scheduled to commence on or about November 17, 2022.

59. On November 14, 2022 — three days before TTAB discovery was due to begin — PopSockets filed Case No. 1:22-cv-04521-SCJ in this Court naming five defendants: (1) Louis Francis Fabec; (2) Yer Thao; (3) Alu Solomon Chukwu; (4) FAB ONE ENTERPRISES LLC; and (5) FAB Cellular LLC. Under 37 C.F.R. § 2.117(a), this filing automatically suspended the TTAB proceedings. The timing was not coincidental — it was calculated to prevent Plaintiff from deposing David Barnett and obtaining PopSockets' internal documents proving fraud on the USPTO.

60. Critically, PopSockets' complaint in the Prior Case requested no specific dollar amount in damages and no injunctive relief. A lawsuit seeking no damages and no injunction is not filed to obtain legitimate judicial relief — it is filed solely as a procedural weapon, confirming the Prior Case was an abuse of process designed to obstruct the TTAB proceedings.

61. Yer Thao and Alu Solomon Chukwu are Plaintiff's legitimate business partners. They had no individual liability for the alleged IP infringement, and their personal inclusion as defendants served no legitimate legal purpose — it was designed to coerce, intimidate, and destroy Plaintiff's business partnerships.

62. PopSockets served three of the five defendants at correct addresses: Louis Francis Fabec, FAB ONE ENTERPRISES LLC, and FAB Cellular LLC.

63. For Yer Thao and Alu Solomon Chukwu, PopSockets used deliberately incorrect addresses: (a) for one defendant, a closed distribution center that was no longer operational; and (b) for the other defendant, a residential address at a house that Plaintiff had sold approximately 18 months earlier. PopSockets knew or had the means to know both addresses were invalid — the same investigative resources that located correct addresses for Fabec, FAB ONE, and FAB Cellular were available to locate correct addresses for Yer Thao and Alu Chukwu. The deliberate use of known-bad addresses constitutes fraud on this Court.

64. Through this fraudulent lawsuit, PopSockets obtained a default judgment in January 2024 premised on fraudulently-obtained trade dress registrations. Plaintiff's Motion to Vacate was denied on October 24, 2024. However, the case was ultimately dismissed without prejudice. Critically, prior to the final dismissal, PopSockets never properly served either Alu Solomon Chukwu or Yer Thao — despite naming them as defendants. Yer Thao was served at a closed distribution center he no longer operated. Alu Solomon Chukwu was served at a residential address he had vacated approximately 18 months prior. Both service attempts were deliberately directed at addresses PopSockets knew were stale or invalid. As a result, neither Alu Chukwu nor Yer Thao ever received service of process, never knew they had been named as federal defendants, and never had an opportunity to respond to or defend against the claims. PopSockets obtained a default judgment bearing their names without ever actually serving them. Their inclusion in the lawsuit served a singular purpose: to use Plaintiff's business partners as named federal defendants — creating reputational harm and personal liability exposure — without ever giving them due process notice. This constitutes both fraud on the Court and a violation of the due process rights of Alu Solomon Chukwu and Yer Thao. PopSockets did not prevail on any claim, and Plaintiff's counterclaims were dismissed without prejudice, preserving them for reassertion in this action.

65. The dismissal without prejudice, combined with PopSockets' July 2, 2025 written admission that its underlying IP claims were 'improper' and 'false,' establishes that the Prior Case terminated in Plaintiff's favor.

66. Defendant Barnett, as Founder, former Chief Executive Officer, and Chairman of the Board of PopSockets, necessarily authorized and approved the filing of the Prior Case. No general counsel initiates a five-defendant federal lawsuit — three days before adverse TTAB discovery — seeking no damages and no injunction, without direct Founder/Chairman approval. This was a strategic corporate warfare decision requiring executive authorization.

**M. PopSockets' Ongoing Infringement of Claim 13 of the '089 Patent**

67. PopSockets currently manufactures, markets, imports, uses, offers for sale, and sells its entire MagSafe-compatible expandable phone grip product line as kits that directly infringe **Claim 13** of the '089 Patent. This includes the standard MagSafe PopGrip line and the PREMIUM MagSafe PopGrip line sold in multiple designs. All variants are packaged and sold as kits with an included separate metal magnetic adapter disc, bearing the admission 'MAGNETIC ADAPTER INCLUDED' on the retail packaging. Plaintiff has obtained and photographed the Accused Products in their retail packaging, confirming the kit configuration and the included adapter disc across multiple design variants.

68. Critically, as of the date of filing this Complaint — April 22, 2026 — PopSockets' own verified official Instagram account (@popsockets) posted Instagram Stories dated April 21, 2026 showing PopSockets actively shipping boxes of the Accused Products in multiple design variants including 'Let's Go Girls' and floral designs. The packaging visible in PopSockets' own social media post displays: (a) 'Magnetic Phone Grip & Stand for MagSafe'; (b) the yellow 'MAGNETIC ADAPTER INCLUDED' badge; and (c) 'MagSafe' branding — confirming active ongoing commercial sales of the infringing kit products on the date of filing. PopSockets' own social media post constitutes a binding admission of ongoing infringement as of the filing date and establishes that injunctive relief is necessary to prevent continuing harm.

67A. A second PopSockets Instagram Story captured on April 22, 2026 — reposted from consumer @clairesawa stating 'Thank you @popsockets!' — shows the 'Unsalty Butter' PREMIUM jelly PopGrip and the 'Toast' PREMIUM jelly PopGrip in retail packaging alongside a text overlay reading 'can you guess my next jelly...?' This post establishes: (a) PopSockets is actively shipping infringing PREMIUM jelly kit products to consumers on the filing date; (b) PopSockets is actively expanding the infringing product line — teasing additional new variants — demonstrating that without injunctive

relief infringement will continue to grow; and (c) PopSockets is shipping and expanding infringing kits while Plaintiff's Amazon storefront simultaneously shows $0.00 in sales and zero units ordered.

67B. A third PopSockets Instagram Story captured on April 22, 2026 — reposted from consumer @rachshines — shows the Pokémon Mew MagSafe PopGrip in retail packaging with the caption: 'Thank you @popsockets for sending over these GORGEOUS Mew grips! I fear I'm gonna need to invest in a Pokémon case now.' This post establishes three additional critical facts: (a) the retail packaging in the image displays the 'ADAPTER INCLUDED' badge in the upper left corner — direct on-packaging confirmation that the adapter disc is included in the kit, satisfying every element of independent **Claim 13** on PopSockets' own product and in PopSockets' own social media post; (b) the product is shown both in packaging and physically mounted on an iPhone demonstrating active commercial use and functionality; and (c) PopSockets has incorporated the infringing kit design into licensed Pokémon character products — among the most commercially valuable product collaborations in consumer electronics accessories. The extension of the infringing kit format into Nintendo/Pokémon licensed products confirms that the infringing design is not incidental but is the commercial foundation upon which PopSockets' entire premium and licensed product strategy is built. Every Pokémon, Sanrio, and other licensed character variant sold as a MagSafe kit with an included adapter disc infringes independent **Claim 13**.

68. Defendants have been aware of Plaintiff's patent rights since at least 2018. PopSockets' citation of Plaintiff's patents in its own Design Patent D1,098,094 S constitutes direct, documentary evidence of Defendants' actual knowledge of the '089 Patent and its claims.

68C. A fourth PopSockets Instagram Story from PopSockets' verified account (@popsockets), captured on May 1, 2026, posted in conjunction with a Pokemon-themed audio track, shows: (a) on the right — the Pokemon Espeon MagSafe PopGrip in retail packaging displaying the 'MAGNETIC ADAPTER INCLUDED' badge prominently in the upper right corner of the packaging, the product labeled 'Magnetic Phone Grip and Stand / Support-Poignee de Telephone Magnetique / for MagSafe' — the bilingual English/French packaging indicating active sales in both the United States and Canada through PopSockets' authorized Canadian distributor Cesium Telecom; and (b) on the left — the Pokemon Umbreon

PopCase for MagSafe, demonstrating that PopSockets is marketing entire MagSafe product ecosystems (grip and case together) built on the infringing expandable magnetic grip technology. The 'MAGNETIC ADAPTER INCLUDED' badge on the Espeon variant constitutes a fifth independent on-packaging admission — across five separate Pokemon and jelly variant product lines — that every MagSafe kit PopSockets sells includes the separate metal disc with adhesive required by independent **Claim 13**. The bilingual English/French packaging additionally confirms active Canadian distribution through Cesium Telecom at the time Cesium declined to carry Plaintiff's competing products, 68A. Facebook Paid Advertisement — Independent Wire Fraud Predicate Act. PopSockets's verified Facebook account (@PopSockets, blue checkmark) ran a paid Facebook advertisement — labeled "Ad" with a public globe icon indicating worldwide targeting — promoting the infringing MagSafe kit products. The advertisement image shows PopSockets retail packaging with the 'MAGNETIC ADAPTER INCLUDED' badge prominently displayed in the upper right corner, alongside a PopSockets PopCase. The packaging displays bilingual English/French text: "Magnetic Phone Grip & Stand / Support-Poignée de Téléphone Magnétique / for MagSafe" and "Compatible with MagSafe® Chargers / Compatible avec les Chargeurs MagSafe®." The advertisement caption reads 'For people who talk about...' and promotes 'Free, Fast, & Reliable Shipping' with a 'Shop now' button. The advertisement received 68 likes and 9 comments, documenting active consumer engagement with the paid promotion. This paid Facebook advertisement constitutes: (a) a sixth independent on-packaging admission that the MAGNETIC ADAPTER is 'INCLUDED' in the kit — across six separate product lines; (b) an independent predicate act of wire fraud under 18 U.S.C. § 1343 — the electronic transmission of a commercial advertisement through Facebook's interstate platform to promote the sale of products that infringe Plaintiff's patent; and (c) additional evidence of ongoing willful infringement, as PopSockets is actively paying to advertise and drive sales of the infringing products through social media channels. This advertisement is attached hereto as Exhibit X.

69. Defendants' infringement of **Claim 13** has been willful and deliberate. Defendants had actual knowledge of the '089 Patent, had actual knowledge of **Claim 13**'s kit configuration, and continued selling infringing kits notwithstanding that knowledge. Plaintiff is entitled to enhanced damages up to three times actual damages pursuant to 35 U.S.C. § 284.

## CAUSES OF ACTION

### COUNT I — INFRINGEMENT OF CLAIM 13 OF U.S. PATENT NO. 11,320,089 B2

**CENTRAL PATENT CLAIM AT ISSUE**

U.S. Patent No. 11,320,089 B2 — Independent Claim 13

**Claim 13** covers a kit comprising: (1) an expandable air bag magnetic phone grip; (2) a separate metal disc; and (3) adhesive on both components for attachment to any mobile device surface — magnetically or by adhesive. **PopSockets cannot remove the metal disc from its MagSafe kit without abandoning the product entirely.** Every PopSockets MagSafe kit sold with an included adapter disc infringes Claim 13. This design-around impossibility makes infringement ongoing and permanent.

70. Plaintiff incorporates by reference all preceding allegations.

71. Plaintiff is the sole inventor and individual owner of all right, title, and interest in U.S. Patent No. **11,320,089 B2**, duly and legally issued by the USPTO on May 3, 2022, with a priority date of December 24, 2018.

72. The Accused Products are the entire PopSockets MagSafe-compatible expandable grip product line sold with an included magnetic adapter ring or disc. Plaintiff has identified 383 separate PopSockets MagSafe product listings on Amazon.com alone, and the Accused Products are additionally sold directly by Walmart Inc. through walmart.com and Walmart retail stores including the Buford Drive Buford Supercenter, Buford, Georgia, labeled 'Sold and shipped by Walmart' at $19.95 per unit as of April 22, 2026. The Accused Products include without limitation: (a) the standard MagSafe PopGrip line including Black (SKU: 806828 PG MSC-Black-BK BK, UPC: 840173727775) and all color variants; (b) the PREMIUM MagSafe PopGrip line including Toast, Strawberry Jam, Butter, Let's Go Girls, floral designs, and all other PREMIUM variants; and (c) all other PopSockets MagSafe-compatible expandable grip products sold with an included magnetic adapter ring or disc (collectively the 'Accused Products'). All Accused Products are sold in kit packaging bearing the admissions 'Magnetic Phone Grip & Stand for MagSafe' and 'MAGNETIC ADAPTER INCLUDED.' Each and every listing and variant

in the MagSafe PopGrip line sold with an included adapter embodies every element of independent **Claim 13** and constitutes a separate act of infringement.

73. **Claim 13** of the '089 Patent is an independent claim that stands alone and is not dependent on any other claim. An element-by-element infringement analysis mapping each **Claim 13** element to specific physical product evidence and documentary exhibits is set forth in Appendix A (Claim Chart), filed contemporaneously with this Complaint and incorporated herein by reference. **Claim 13** claims, in its entirety: "The air bag type magnet holder, comprising a kit, the kit comprising the airbag type magnetic holder comprising: an inner base that is attachable to a mobile device; an outer magnet base having a magnet configured for magnetically attaching the magnet holder, including a mobile device that can be attached to the inner base, to an external surface containing metal that is distinct from the magnet holder; and an expandable air bag including a first end connected to the inner base and a second end connected to the outer magnet base and configured to have at least an expanded position extending the expandable air bag along a first axis providing clearance for a user's fingers between the inner base and the outer magnet base and a contracted position holding the outer magnet base proximate to the inner base; and a separate metal disc, wherein an adhesive is on the inner base, and a second adhesive is on the separate metal disc."

73A. PopSockets' own website constitutes a direct admission of the kit configuration claimed in **Claim 13**. PopSockets sells tens of thousands of units of the Accused Products monthly through its own website popsockets.com and through its authorized national distribution network. PopSockets' authorized distributors, as listed on popsockets.com, include: (1) AlphaComm, 1500 Lakes Parkway, Lawrenceville, Georgia 30043, (678) 236-9999 — PopSockets' authorized distributor in this District, which establishes venue for patent claims in this Court under TC Heartland; (2) Superior Communications, 5027 N. Irwindale Avenue, Suite 900, Baldwin Park, California 91706, (626) 388-2530; (3) VoiceComm, 175 Derousse Ave, Pennsauken, New Jersey 08110, (800) 803-1321; (4) ice Mobility, 610 Schelter Rd, Lincolnshire, Illinois 60069, (833) 902-0994; and (5) Cesium Telecom, 5798 Ferrier Street, Montreal, Quebec H4P 1M7, Canada, (877) 798-8686. Each of these authorized distributors receives, stores, markets, and sells the infringing MagSafe kit products to retail partners and end consumers throughout the United States and Canada. On PopSockets' website at popsockets.com, the product page for the Magnetic Adapter

Ring displays a prominent button stating 'Complete Your Kit' — the identical terminology used in independent **Claim 13** of the '089 Patent ('comprising a kit'). PopSockets uses the word 'Kit' — the exact term used in **Claim 13** — to describe the combination of its expandable magnetic grip and the separate Magnetic Adapter Ring. This constitutes a binding commercial admission by PopSockets that: (a) its Magnetic Adapter Ring and MagSafe PopGrip together form a 'kit' within the meaning of **Claim 13**; (b) the kit configuration is PopSockets' intended commercial use; and (c) PopSockets has adopted the precise claim language of the patent it is alleged to infringe as its own product marketing terminology. A screenshot of this button on the Magnetic Adapter Ring product page (product ID 702287) is attached hereto as Exhibit B. The same page identifies the Magnetic Adapter Ring as a separate component priced at $7, confirms it is sold in demand ('50 orders in the last 7 days'), and shows the adapter ring as a distinct separate metal disc from the grip — directly mapping to the 'separate metal disc' element of **Claim 13**.

73B. The Amazon product description for the Accused Product constitutes an element-by-element admission of every limitation of independent **Claim 13**. PopSockets' own Amazon listing states: 'Our round PopGrip compatible with MagSafe is a wireless charging compatible phone grip. Includes an adapter ring to give any phone without MagSafe capabilities the ability to use magnetic phone accessories. Attach the adapter ring to your Android/Pixel/iPhone (or any non-MagSafe case) to enable magnetic grip technology. PopSockets circular PopGrip compatible with MagSafe lets you kickstand your phone up anywhere you go, use your phone one-handed, and prevents drops. When you're done, it collapses flat.' This description admits every element of **Claim 13** as follows: (i) 'a kit' — 'Includes an adapter ring' — the word 'Includes' establishes the adapter ring is part of the product as sold, constituting a kit containing both the grip and the separate metal disc; (ii) 'an inner base that is attachable to a mobile device' — 'compatible with MagSafe' and 'attach the adapter ring to your Android/Pixel/iPhone' — the inner base attaches to a mobile device either via MagSafe or via the adapter ring adhesively attached to the phone; (iii) 'an outer magnet base having a magnet configured for magnetically attaching the magnet holder...to an external surface containing metal' — 'wireless charging compatible' and 'magnetic phone accessories' and 'magnetic grip technology' — the outer magnet base contains magnets configured to attach to external metal surfaces including MagSafe chargers and car mounts; (iv) 'an expandable air bag...configured

to have at least an expanded position...providing clearance for a user's fingers' — 'use your phone one-handed' — the air bag expands to provide finger clearance for one-handed use, exactly as claimed; (v) 'a contracted position holding the outer magnet base proximate to the inner base' — 'When you're done, it collapses flat' — PopSockets expressly admits the contracted position in the phrase 'collapses flat,' meaning the outer magnet base is held flat and proximate to the inner base, exactly as claimed; (vi) 'a separate metal disc' — 'Includes an adapter ring' — the adapter ring is the separate metal disc, included as a separate component in the kit; and (vii) 'wherein an adhesive is on the inner base, and a second adhesive is on the separate metal disc' — 'Attach the adapter ring to your Android/Pixel/iPhone' — the adapter ring is attached to the phone by adhesive, admitting the second adhesive on the separate metal disc. PopSockets' own Amazon product description thus constitutes a complete, element-by-element admission of infringement of every limitation of independent **Claim 13** of the '089 Patent. Amazon's own product photography for the Accused Product — a 'Compatibility Check' diagram bearing the PopSockets logo and the heading 'With Included PopSockets Adapter Ring' — shows the adapter ring being adhesively applied to a Samsung Galaxy, an iPhone with clear case, and a Kindle device, with the express caption: 'Make any case or device MagSafe with the included adapter ring (iPhone, Samsung, Pixel, Android, Kindle, iPad).' The same product image depicts a PopSockets MagSafe phone case with a built-in metal ring alongside an iPhone, captioned 'iPhone MagSafe Cases and PopCase for Kindle' -- directly confirming the MagSafe case-as-separate-metal-disc theory of infringement set forth in Paragraph 74B. This Amazon product photography is attached hereto as Exhibit D and incorporated herein by reference.

74. The Accused Product infringes every element of independent **Claim 13** as follows:

74A.    Critical    **Design-Around    Impossibility**.    Before    addressing    the element-by-element analysis, Plaintiff notes that Defendants **cannot design around Claim 13** without abandoning the MagSafe PopGrip product entirely. **Claim 13** covers a kit comprising the grip AND a separate metal disc — where the metal disc has adhesive on it for attachment to a mobile device. This design is commercially essential to PopSockets' MagSafe line because: (a) without the included metal disc, non-MagSafe phone users (Android, Samsung, Pixel, etc.) **cannot use the magnetic grip at all; (b) PopSockets' own packaging admits 'MAGNETIC ADAPTER INCLUDED — Make any device MagSafe compatible'; and (c) the entire value**

proposition of PopSockets' MagSafe PopGrip for the non-iPhone market depends on the included metal disc. PopSockets cannot sell the MagSafe kit without the included adapter disc — and as long as they include the adapter disc with adhesive in the kit, they infringe Claim 13. This design-around impossibility means infringement is ongoing, permanent, and cannot be cured except by abandoning the product. It also establishes that a permanent injunction — not merely ongoing royalties — is the appropriate remedy, because no reasonable royalty adequately compensates Plaintiff for being permanently excluded from the market for a product that cannot be practiced without his patent. (a) 'The air bag type magnet holder, comprising a kit' — The Accused Product is sold as a packaged kit. PopSockets' own packaging admits: 'Magnetic Phone Grip & Stand for MagSafe.' The product is an air bag type magnetic holder sold as a complete kit; (b) 'An inner base that is attachable to a mobile device' — The Accused Product's inner base attaches to a mobile device via MagSafe magnetic attachment or via the included magnetic adapter ring adhesively attached to the device. PopSockets admits: 'Works with MagSafe compatible cases, or paired with the included magnetic adapter' and 'MAGNETIC ADAPTER INCLUDED — Make any device MagSafe compatible'; (c) 'An outer magnet base having a magnet configured for magnetically attaching the magnet holder...to an external surface containing metal that is distinct from the magnet holder' — The Accused Product's outer base contains approximately 16 or more individual disc-shaped magnet inserts arranged radially in a ring configuration, observable in Plaintiff's physical dissection photographs. These magnets attach the holder to external metal surfaces including car mounts and other magnetic accessories. PopSockets admits: 'Snap on and off,' 'Connect with MagSafe,' and 'Compatible with MagSafe Chargers'; (d) 'An expandable air bag including a first end connected to the inner base and a second end connected to the outer magnet base' — The Accused Product contains an expandable air bag structure with its first end connected to the inner base and its second end connected to the outer magnet base, confirmed by Plaintiff's physical dissection of the product; (e) 'Configured to have at least an expanded position extending the expandable air bag along a first axis providing clearance for a user's fingers between the inner base and the outer magnet base' — The Accused Product expands to create a finger grip providing clearance between the inner and outer bases, documented in

**photographs showing the grip in the expanded position; (f) 'And a contracted position holding the outer magnet base proximate to the inner base' — The Accused Product contracts to hold the outer base flat and proximate to the inner base against the phone, as shown in photographs; (g) 'And a separate metal disc' — Every Accused Product is sold with an included separate metal adapter disc/ring. PopSockets admits on packaging: 'MAGNETIC ADAPTER INCLUDED.' Critically, PopSockets' own website uses the button label 'Complete Your Kit' on the Magnetic Adapter Ring product page — a direct binding admission that the adapter ring and grip together constitute a 'kit,' using the exact terminology of Claim 13**. PopSockets sells the Magnetic Adapter Ring as a separate product for $7, confirming it is a separate component — a 'separate metal disc' — within the kit; (h) 'Wherein an adhesive is on the inner base' — The included magnetic adapter ring has an adhesive layer on its bottom surface for attachment to the phone or case. PopSockets' packaging instructions admit: 'Remove adapter liner' (Step 3, revealing adhesive) and 'Place adapter in center of guide, press firmly' (Step 4); and (i) 'And a second adhesive is on the separate metal disc' — The separate metal disc contains adhesive on one side for device attachment. PopSockets admits: 'Adapter for Magnetic Compatibility.' Infringement is complete upon sale of the kit, as the kit as sold contains every element of independent **Claim 13**.

76. The scale of Defendants' infringement is massive and documented by live sales data as of April 22, 2026. On Amazon.com, Plaintiff has identified 383 separate PopSockets MagSafe product listings. Multiple variants independently show 10,000+ units bought per month — the Black variant shows 9,000+ units per month and the Clear variant independently shows 10,000+ units per month, meaning the aggregate monthly sales across all variants substantially exceeds these individual figures. Across all variants and listings, Amazon.com is the Shipper/Seller — Amazon.com itself directly sells and ships the Accused Products. Three additional third-party sellers on Amazon further sell the same infringing product at $19.95 per unit. Amazon promotes the Accused Products through its 'Add to Auto Buy' repeat purchase feature, generating ongoing recurring infringing sales. The current price of $19.95 is confirmed as the '90-day low price,' establishing this has been the consistent price point. The infringing product line extends to licensed character collaborations including Sanrio Cinnamoroll variants, demonstrating PopSockets has incorporated the infringing kit design into its highest-value premium and licensed product lines.

Additionally, Defendant Walmart Inc. directly sells and ships the Accused Product through walmart.com and its retail stores at $19.95 per unit, labeled 'Sold and shipped by Walmart,' with same-day availability. The aggregate volume of infringing sales across Amazon's 383 documented MagSafe kit listings, Walmart's retail and online channels, and all other retail channels represents substantial ongoing damages in an amount to be determined at trial. Every unit sold across all channels constitutes a separate act of infringement of independent **Claim 13**.

74B. Expanded Scope of Infringement — MagSafe Phone Cases as the Separate Metal Disc. **Claim 13** requires a kit comprising the expandable magnetic grip AND a separate metal disc with adhesive for attachment to a mobile device. The "separate metal disc" element of **Claim 13** is satisfied not only by the standalone magnetic adapter ring included in PopSockets' MagSafe grip kits, but also by any MagSafe-compatible phone case that contains a built-in metal ring or magnetic plate — because such a case functions as the separate metal disc for purposes of **Claim 13**. PopSockets sells MagSafe phone cases (including the "Moon Flower iPhone 17 Pro Max MagSafe Case" at 0.00 shown on popsockets.com) that contain built-in MagSafe-compatible metal plates. When PopSockets cross-sells or bundles a MagSafe PopGrip with a MagSafe phone case — as evidenced by the "Complete Your Kit" button displayed on every MagSafe PopGrip product page — the combination constitutes the complete **Claim 13** kit: (1) the expandable air bag magnetic grip; (2) the metal disc element (embedded in the MagSafe case); and (3) the adhesive/attachment means (the case attaches to the phone). PopSockets is therefore liable for infringement of **Claim 13** through sales of MagSafe phone cases marketed alongside or bundled with MagSafe grips, in addition to infringement through the standalone adapter ring kits. 74B-1. Standalone Adapter Ring Sales Independently Infringe **Claim 13**. PopSockets sells the Magnetic Adapter Ring — the exact component that constitutes the "separate metal disc" element of **Claim 13** — as a standalone product on popsockets.com/en-us/accessories/adapter-rings at .00 per unit (product ID 702287, available in Black and White, 116 reviews, 5-star rating). The product page confirms: (a) "Magnetic adapter ring included" — PopSockets' own description of this component as an "included" element confirms its kit function; (b) "Upgrade your non-MagSafe or Android case to MagSafe" — PopSockets' own description of the ring's function precisely matches the function described in Plaintiff's 2018 Patent Abstract: attachment of a magnetic system to any mobile device surface;

(c) "Strong magnetic lock on MagSafe accessories" — confirming the ring creates the magnetic attachment interface claimed in the '089 Patent; and (d) as of May 3, 2026, the product displays "67 orders in the last 7 days" with the "Complete Your Kit" button prominently displayed, cross-selling the adapter ring with the MagSafe grip. Every standalone adapter ring sold to a consumer who combines it with any MagSafe PopGrip — whether purchased together or separately — constitutes the complete **Claim 13** kit and an independent act of infringement. PopSockets is therefore liable for infringement arising from standalone adapter ring sales, kit sales, and case-plus-grip combinations — the full scope of its MagSafe product ecosystem infringes independent **Claim 13** in every commercial configuration.

74C. Live Sales Velocity Evidence. As of May 3, 2026 — the filing date of this Complaint — the PopSockets Enamel Luna Moth MagSafe PopGrip (popsockets.com/en-us/p/grips/enamel-luna-moth----magsafe-popgrip/809137.html, listed at 5.00 per unit, part of the "Bookish Vol. 2" licensed collection) displays a live sales indicator stating "In Demand: 362 orders in the last 7 days." This single SKU alone generated approximately 2,670 in revenue in the seven days immediately preceding the filing of this Complaint. Across 383 infringing MagSafe kit listings on Amazon.com and PopSockets' own website, plus Walmart retail and online channels, and PopSockets' national distribution network, the aggregate infringing sales on the filing date represent hundreds of thousands of dollars per week in revenue from products that infringe Plaintiff's independent **Claim 13**. The "Complete Your Kit" button remains prominently displayed on every PopSockets MagSafe PopGrip product page as of the filing date — PopSockets' own characterization of its infringing product as part of a "kit" confirming the kit element of **Claim 13** in real time.

75. Defendants' infringement is willful, established by four independent categories of evidence: (a) Actual Knowledge from Patent Citations: PopSockets' own Design Patent D1,098,094 S expressly cites U.S. Patent No. **11,320,089 B2** as prior art. A party that cites a patent in its own patent prosecution has actual knowledge of that patent as a matter of law; (b) Adoption of Plaintiff's Proprietary Patent Terminology: PopSockets now sells a product called 'Airbag Jelly Bear — MagSafe PopGrip,' using the exact 'air bag' terminology that is unique to Plaintiff's '089 Patent claims. No competing product used this terminology before Plaintiff's patent. PopSockets' deliberate adoption of Plaintiff's patented 'air bag' language in its own product names constitutes direct evidence of actual knowledge and willful copying; (c) False

Advertising of Inventorship: PopSockets publicly advertises: 'The OG Grip Brand — We literally invented this.' This claim is false. Plaintiff's priority date of December 24, 2018 and commercial use date of April 1, 2018 predate PopSockets' magnetic grip products by years. Plaintiff invented the expandable magnetic phone grip. This false claim is separately actionable under Count VI; and (d) 'Complete Your Kit' — Deliberate Use of Claim Language: PopSockets' own website displays the call-to-action button 'Complete Your Kit' on its Magnetic Adapter Ring product page, using the exact word 'Kit' that appears in independent **Claim 13**. A company that has reviewed Plaintiff's patent — confirmed by their own citation of it as prior art — and then adopts the precise claim language to market its product demonstrates actual knowledge of the claim scope and willful disregard of Plaintiff's patent rights.

76. As a direct result of Defendants' willful infringement of independent **Claim 13** of the '089 Patent, Plaintiff has suffered damages in an amount to be determined at trial. Amazon.com directly sells tens of thousands of infringing PopSockets MagSafe kit products monthly. Defendants maintain 383 or more separate infringing MagSafe kit product listings on Amazon.com alone, as documented by Amazon search results for brand:PopSockets MagSafe products captured May 3, 2026 and attached hereto as Exhibit F. Amazon.com serves as the direct Shipper and Seller of the Accused Products — not as a passive marketplace host. Amazon's own listing data as of April 21-22, 2026 documents the scale of this direct infringement: the Black variant alone shows 9,000+ units bought per month; the Clear variant shows 10,000+ units bought per month — both sold with the included metal adapter disc that constitutes the infringing kit under **Claim 13**. These two variants alone total approximately 19,000+ units per month. Across all 383 infringing Amazon MagSafe listings — including the PREMIUM jelly variants (Toast, Butter, Strawberry Jam, Let's Go Girls), the licensed Pokémon variants, and all other MagSafe kit variants sold with included adapter discs — the aggregate monthly infringing sales on Amazon.com alone total tens of thousands of units per month, each unit sold at $19.99 to $35.00 or more. At a conservative estimate of 20,000 units per month at an average price of $22.00, Amazon.com alone generates approximately $440,000 in monthly revenue from direct sales of the Accused Products — over $5,280,000 annually — in addition to Walmart's and PopSockets' separate direct sales. The complete picture of aggregate monthly infringement across all three channels is as follows: Amazon.com direct sales — tens of thousands of units per month generating approximately $440,000 or more in

monthly revenue; Walmart.com and Walmart retail stores — tens of thousands of additional units per month at $19.95 per unit; and PopSockets direct sales through popsockets.com and its authorized distribution network — including AlphaComm (1500 Lakes Parkway, Lawrenceville, Georgia 30043) distributing to retail partners — tens of thousands of additional units per month through wholesale and direct-to-consumer channels. The aggregate infringement across all three defendants' direct sales channels totals hundreds of thousands of infringing units sold per month. At a blended average price of approximately $22.00 per unit and a conservative total of 60,000 units per month across all channels, aggregate monthly infringing revenue exceeds $1,320,000 — over $15,840,000 per year. These figures apply only to the period from patent issuance on May 3, 2022 to present; the complete damages calculation including lost profits, reasonable royalties, and enhanced damages under 35 U.S.C. § 284 will be determined at trial. These figures establish both the scale of irreparable harm to Plaintiff — whose Amazon dashboard showed $0.00 in sales on the filing date of this Complaint — and the magnitude of damages for which Defendants are jointly and severally liable. Plaintiff is entitled to enhanced damages up to three times actual damages pursuant to 35 U.S.C. § 284, reasonable attorney's fees pursuant to 35 U.S.C. § 285, an ongoing royalty, and a permanent injunction.

---

## COUNT II — CIVIL RICO VIOLATIONS — 18 U.S.C. § 1962(c)

77. Plaintiff incorporates by reference all preceding allegations.

78. The RICO Enterprise. Defendants PopSockets LLC, David Barnett, Amazon.com,

(Against All Defendants) Walmart Inc., together with their attorneys and agents, constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the 'Enterprise'). The Enterprise is distinct from the individual Defendants named as RICO persons. The Enterprise is engaged in and its activities affect interstate commerce, including the manufacture, importation, marketing, and sale of phone grip accessories throughout the United States and internationally. Amazon's role in the Enterprise is as both the platform that processed 529+ findings of no infringement while accepting the direct commercial beneficiary of PopSockets' PopSockets' infringing sales — Amazon profits as Shipper/Seller from every infringing false complaints, and as PopSockets MagSafe kit sold on its platform.

79. The Noerr-Pennington Sham Exception. Defendants cannot invoke the Noerr-Pennington doctrine to immunize their IP complaint campaign because the complaints fall squarely within the 'sham' exception established in Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49 (1993). The sham exception applies where: (a) the petitioning activity is objectively baseless — no reasonable litigant could realistically expect success on the merits; and (b) the activity is subjectively motivated by a desire to interfere with competition rather than to obtain legitimate relief. Both elements are conclusively established here: (a) Objective baselessness — Amazon ruled against PopSockets in over 529 separate appeal proceedings finding no infringement; PTAB cancelled PopSockets' core patent claims on August 12, 2019; and PopSockets itself admitted in writing on July 2, 2025 that its complaints were 'improper' and 'false' — demonstrating that no reasonable litigant could have expected to prevail; (b) Subjective bad faith — Defendants continued filing complaints for years after Amazon's 529 rulings of no infringement, after PTAB's patent cancellation, and directed Plaintiff to 'contact PopSockets directly' after destroying his Walmart relationship — demonstrating the complaints were designed to suppress competition, not protect IP rights.

80. Pattern of Racketeering Activity — Rule 9(b) Particularity. Defendants conducted and participated in the conduct of the affairs of the Enterprise through the following pattern of racketeering activity, pled with the particularity required by Fed. R. Civ. P. 9(b): (a) Wire Fraud — 18 U.S.C. § 1343. Each of the following transmissions constitutes a separate predicate act of wire fraud. Defendants transmitted false IP complaints through electronic interstate commerce systems with actual knowledge that the representations were false: (i) Beginning June 19, 2018 and continuing through November 2018, Defendants transmitted false IP complaints through Amazon Brand Registry's electronic system asserting Patent 8,560,031 against Plaintiff's products — while IPR2018-00497, filed January 15, 2018, had already placed those patent claims under active IPR challenge. Defendants knew the patent was under challenge yet represented to Amazon that Plaintiff's products infringed valid patent rights. This constitutes wire fraud from the first 2018 complaint forward because Defendants used a patent they knew was under challenge as if it were valid, with no disclosure to Amazon of the pending IPR; (ii) Throughout 2019, 2020, and 2021, Defendants continued transmitting false IP complaints — including after August 12, 2019, when the PTAB Final Written Decision found Claims 9, 10, 11, 16, and 17 of

Patent 8,560,031 unpatentable. After that date, Defendants had no valid patent basis for any complaint but continued filing them anyway; (iii) On or about May 6, 2019, Defendant PopSockets, through employee Andi Janicki, transmitted a false trademark complaint via interstate electronic communication (email through fakes@popsockets.com) directly ZizoWireless, Plaintiff's distributor, falsely claiming Plaintiff's patented FAB POPS products were 'counterfeit' and infringed PopSockets' 'POP' trademark (Reg. No. 5,662,835). Janicki signed this complaint under penalty of perjury. Every material representation was false: Plaintiff's products are not counterfeit (they are covered by issued U.S. patents); Plaintiff's FAB POPS mark does not infringe the 'POP' mark (they are distinct marks and Plaintiff is the senior user); and the complaint constituted wire fraud causing direct destruction of the Balaji/ZizoWireless distribution agreement. This single complaint destroyed Plaintiff's Cricket Wireless distribution pipeline and handed that distribution channel to PopSockets; (iv) In 2022 alone — after the March 12, 2021 Certificate of Cancellation formally eliminated the patent claims — Defendants transmitted a minimum of 401 false trademark complaints through Amazon Brand Registry's electronic system. With no valid patent basis after March 2021 and fraudulently-obtained trade dress registrations as the only remaining tool, each of the 401 complaints in 2022 constitutes a separate predicate act of wire fraud, totaling a minimum of 401 predicate acts in a single calendar year. Plaintiff possesses approximately 100 or more Amazon reinstatement letters and appeal determination emails dating from 2022 through 2025, each documenting Amazon's affirmative finding that a specific PopSockets complaint against a specific Plaintiff ASIN was without merit. These 100+ letters constitute a representative sample of the 529+ total appeal proceedings and will be produced as exhibits at trial, constituting direct documentary proof of at least 100 separate predicate acts of wire fraud. The complete record of all 529+ appeal proceedings — including dates, specific ASINs, complaint bases cited by PopSockets, and Amazon's specific findings of no infringement — is maintained in Amazon's Seller Central records and will be obtained through third-party discovery directed to Amazon. Plaintiff expressly demands production of all Amazon Brand Registry complaint records, IP complaint submissions, appeal determinations, and account health notifications relating to Plaintiff's seller accounts from 2018 through 2025 as part of discovery in this action; (v) On or about April 15, 2025, PopSockets transmitted a threatening message to Plaintiff's Shopify storefront via interstate electronic communication stating: 'You are hereby ordered to immediately cease and desist from selling your

product in accordance with case 1:22-cv-04521... You lost your appeal we will shut down this website' — weaponizing the fraudulently-obtained default judgment as an interstate wire communication to threaten shutdown of Plaintiff's website, constituting wire fraud and extortion predicate acts; (vi) On February 6, 2025, Defendants transmitted a false IP complaint through Amazon's Brand Registry enforcement system asserting Mexican Trademark Registration No. 1735885 as the basis to suppress Plaintiff's U.S. listings and quarantine 442 units of U.S. inventory. Amazon cross-bordered this complaint, applying a foreign trademark registration to restrict lawful U.S. commerce without valid U.S. legal authority. This predicate act — the use of a foreign intellectual property instrument to suppress U.S. commerce through interstate electronic channels — constitutes wire fraud and falls squarely within the 4-year RICO statute of limitations; (b) Mail Fraud — 18 U.S.C. § 1341. Defendants transmitted false cease and desist letters and IP enforcement correspondence through the United States mails to Plaintiff, Plaintiff's business partners, and retail partners including Walmart and Balaji Trading, containing materially false representations that Plaintiff's products infringed PopSockets' intellectual property rights; (c) Fraud on the USPTO — 18 U.S.C. § 1001. On or about January 4, 2019, Defendants filed Trade Dress Applications Serial Nos. 88/224,037 and 88/224,046 with the USPTO. those applications and subsequent prosecution, Defendant Barnett executed sworn declarations on September 13, 2019 representing that the accordion design was 'ornamental, not functional.' These representations were materially false: 32 days earlier, on August 12, 2019, the PTAB had ruled in IPR2018-00497 that the identical accordion structure was functional and anticipated by prior art. Defendants made these false representations to the USPTO with intent to obtain trade dress registrations that would replace their cancelled patent as an enforcement weapon against Plaintiff; (d) Obstruction of Federal Proceedings — 18 U.S.C. § 1512(c)(2). In November 2022, Defendants filed Case No. 1:22-cv-04521-SCJ with deliberate use of wrong addresses for Yer Thao and Alu Solomon Chukwu, timed immediately before a critical TTAB proceeding, with the purpose of triggering automatic suspension of Plaintiff's trademark cancellation petitions under 37 C.F.R. § 2.117(a).

81. Pattern and Continuity. The racketeering activity constitutes a 'pattern' under 18 U.S.C. § 1961(5) satisfying both the 'relatedness' and 'continuity' requirements established in H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989): (a) Relatedness — all predicate acts share the same purpose (eliminating Plaintiff as a

competitor), the same participants (PopSockets and Barnett), the same victims (Plaintiff and his business partners), and the same method (false IP enforcement); (b) Closed-ended continuity — the pattern spans more than seven years from 2018 through 2025, with hundreds of predicate acts, satisfying the substantial period requirement; and (c) Open-ended continuity — the threat of continued racketeering activity is present because Defendants continue to sell infringing products and have not ceased their false enforcement activities.

82. Statute of Limitations. The RICO statute of limitations is four years from the date Plaintiff knew or should have known of his injury. 18 U.S.C. § 1964(c); Agency Holding Corp. v. Malley-Duff & Associates, 483 U.S. 143 (1987). Plaintiff's RICO claims are timely because: (a) the most recent predicate acts — the February 2025 Mexican marketplace complaint causing a 129-150 day inventory quarantine — occurred within four years of filing; (b) under the separate accrual rule, each new predicate act within the limitations period independently restarts the limitations period for damages flowing from that act; and (c) Defendants' fraudulent concealment of the true nature and extent of their scheme tolled the statute of limitations until PopSockets' July 2, 2025 written admission that its complaints were 'improper' and 'false' — which for the first time publicly confirmed the fraudulent nature of the entire campaign.

83. Plaintiff was injured in his business and property by reason of Defendants' RICO violations, including: destruction of the Walmart national retail distribution opportunity; destruction of the Balaji/Cricket Wireless partnership; loss of the Valor Communications distribution relationship; loss of the Cesium Canadian distribution opportunity — a Canadian managing director explicitly declined to carry Plaintiff's products in February 2026 stating he could not 'go up against PopSockets in Canada even if we were certain there were no patent violations'; permanent closure of marketplace accounts on Etsy (twice) and eBay; destruction of U.S. manufacturing operations and loss of Plaintiff's warehouse facility — both a direct and proximate result of the revenue destruction caused by the false complaint campaign; ongoing lost sales and market suppression; the fraudulent Prior Case default judgment described in Count X herein.

84. Plaintiff is entitled to treble damages and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT III — RICO CONSPIRACY — 18 U.S.C. § 1962(d)

85. Plaintiff incorporates by reference all preceding allegations.

86. Defendants conspired to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of the PopSockets enterprise through the pattern of racketeering activity described in Count IV.

87. Each Defendant knowingly agreed to and facilitated the conspiracy: PopSockets provided the enterprise structure and operational capability; Defendant Barnett personally authorized and directed the illegal scheme as Chief Executive Officer and Chairman of the Board, including personally approving the federal lawsuit strategy designed to obstruct TTAB proceedings.

88. Plaintiff is entitled to treble damages and attorney's fees pursuant to 18 U.S.C. § 1964(c).

---

## COUNT IV — SHERMAN ACT § 1 — CONSPIRACY IN RESTRAINT OF TRADE

89. Plaintiff incorporates by reference all preceding allegations. 15 U.S.C. § 1 | Against All Defendants

90. Defendants entered into agreements, express or implied, to restrain trade in the relevant market for expandable phone grip accessories. Under Interstate Circuit, Inc. v. United States, 306 U.S. 208 (1939), and Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752 (1984), a Sherman Act § 1 conspiracy may be established through circumstantial evidence where: (a) the defendants' conduct would be against each defendant's individual economic interest absent an agreement; and (b) the evidence tends to exclude the possibility of independent action. Both elements are satisfied here — Walmart acting against its own interest as a retailer by excluding a patent-holding seller at a competitor's direction, and Amazon enforcing false IP complaints against a seller it repeatedly cleared, are inexplicable absent coordination with PopSockets. Three separate agreements are established by direct and circumstantial evidence: (a) PopSockets-Walmart Agreement — The Walmart Vice President's direct statement to Plaintiff and Alu Solomon Chukwu that Walmart 'had to look out for PopSockets,' followed 45 days later by Walmart's 'business decision' email removing Plaintiff's products, demonstrates a direct agreement between PopSockets and Walmart to exclude Plaintiff from national retail distribution channels

while protecting PopSockets' market position; (b) PopSockets-Amazon Agreement — Amazon processed 529+ IP appeals finding no infringement by Plaintiff, yet continued accepting and enforcing PopSockets' false complaints against Plaintiff while simultaneously selling PopSockets' products as Shipper/Seller. Amazon suppressed Plaintiff's competing products through false complaint enforcement while generating direct revenue as the Seller and Shipper of PopSockets' infringing products. Amazon's February 2025 quarantine of 442 units of Plaintiff's inventory based on a false Mexican trademark complaint — while continuing to sell PopSockets' infringing products — demonstrates Amazon's coordinated participation in the scheme to exclude Plaintiff; and (c) PopSockets-Walmart-Amazon Coordinated Exclusion — The combined effect of PopSockets' false complaint campaign, Amazon's enforcement and direct sales of infringing products, and Walmart's 'business decision' to exclude Plaintiff while selling the infringing substitute has foreclosed Plaintiff from every major retail distribution channel in the United States.

91. These agreements unreasonably restrained trade by foreclosing Plaintiff's access to every major retail distribution channel, reducing competition, and maintaining PopSockets' market dominance through coordinated non-competitive means.

92. Plaintiff suffered antitrust injury in the form of lost distribution relationships, lost business partnerships, and ongoing market suppression. Plaintiff is entitled to treble damages under 15 U.S.C. § 15.

---

## COUNT V — SHERMAN ACT § 2 — MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION 15 U.S.C. § 2 | Against All Defendants

93. Plaintiff incorporates by reference all preceding allegations.

96. The relevant product market is expandable magnetic phone grip accessories sold in the United States — specifically, expandable grip devices that use a collapsible air bag mechanism and magnetic attachment to enable users to grip a mobile phone and magnetically attach it to external surfaces. This market is defined by reasonable interchangeability of use and cross-elasticity of demand: consumers seeking expandable magnetic grip functionality cannot substitute non-expandable grips or non-magnetic grips for this specific functionality. The relevant geographic market is the United States.

94. PopSockets possesses monopoly power in this relevant market. PopSockets holds dominant market share — its Amazon listing for the Accused Product alone shows it is the #1 Best Seller in Cell Phone Grips with over 95,000 customer reviews and 10,000+ units sold monthly. PopSockets' dominance was achieved and maintained not through superior products or competition on the merits but through the systematic exclusionary conduct described herein.

95. PopSockets willfully acquired and maintained monopoly power through exclusionary conduct with no legitimate procompetitive justification: (a) filing 557+ false IP complaints against Plaintiff — the primary competing patent holder — with actual knowledge the complaints were baseless; (b) directly interfering with Plaintiff's Walmart and Balaji distribution relationships to foreclose retail channels; (c) filing a fraudulent federal lawsuit to obstruct Plaintiff's TTAB cancellation petitions; (d) obtaining fraudulent trade dress registrations to replace cancelled patent claims as an enforcement weapon; and (e) coordinating with Amazon — which simultaneously cleared every single PopSockets complaint against Plaintiff's products — 529+ rulings of no infringement — while simultaneously selling PopSockets' infringing products as direct Seller/Shipper — to ensure Plaintiff's competing products remained suppressed while PopSockets' infringing products dominated the Amazon marketplace. None of this conduct constitutes competition on the merits.

96. Plaintiff suffered antitrust injury — injury of the type the antitrust laws were designed to prevent — in the form of exclusion from retail distribution channels, destruction of business partnerships, and suppression of a competing patented product, all of which harm competition by removing the only patent-priority competitor from the expandable magnetic phone grip market.

97. Plaintiff is entitled to treble damages under 15 U.S.C. § 15.

---

## COUNT VI — LANHAM ACT FALSE ADVERTISING — 15 U.S.C. § 1125(a)

98. Plaintiff incorporates by reference all preceding allegations.

99. Defendants have made and continue to make materially false statements of fact in commercial advertising and promotion, including: (a) PopSockets publicly advertises on its website: 'The OG Grip Brand — We literally invented this.' This statement is materially false. Plaintiff's commercial use date of April 1, 2018 and patent priority

date of December 24, 2018 predate PopSockets' magnetic grip products. Plaintiff, not PopSockets, invented the expandable magnetic phone grip technology. PopSockets made this false claim in interstate commerce to misdirect consumers and retailers away from Plaintiff's products; (b) Defendants made false representations in over 557 IP enforcement notices transmitted to Amazon, Etsy, eBay, and other platforms claiming Plaintiff's products infringed PopSockets' intellectual property — claims PopSockets admitted in writing on July 2, 2025 were 'improper' and 'false'; and (c) Defendants made false declarations to the USPTO claiming the accordion design was 'ornamental, not functional,' directly contradicting the PTAB's August 12, 2019 ruling.

100. Defendants' false advertising claims deceived the relevant purchasing public, Plaintiff's retail partners including Walmart and Balaji Trading, and online platform administrators, and caused direct commercial injury to Plaintiff.

101. Plaintiff is entitled to Defendants' profits, actual damages, costs of corrective advertising, and enhanced damages for willful violations under 15 U.S.C. § 1117.

---

## COUNT VII — DECLARATORY JUDGMENT OF INVALIDITY AND UNENFORCEABILITY; COMMON LAW FRAUD 28 U.S.C. §§ 2201-2202; Against Defendant PopSockets LLC and David Barnett

102. Plaintiff incorporates by reference all preceding allegations.

103. An actual, justiciable controversy exists between Plaintiff and Defendants regarding the validity and enforceability of Trade Dress Registration Nos. 6,005,169 and 6,005,170 and Word Mark Registration No. 5,662,835. Defendants have repeatedly asserted these registrations against Plaintiff in 557+ enforcement actions spanning 2018-2025, and these registrations formed the basis of the fraudulent Prior Case. Plaintiff requires a declaratory judgment to resolve this controversy and remove the cloud these fraudulently-obtained registrations cast over Plaintiff's lawful business.

104. Plaintiff is entitled to a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 declaring that: (a) Trade Dress Registration Nos. 6,005,169 and 6,005,170 are invalid and unenforceable due to fraud on the USPTO, functionality, and Plaintiff's prior rights; and (b) Word Mark Registration No. 5,662,835 is invalid and unenforceable due to fraud on the USPTO, Case-Mate's prior rights, and Plaintiff's prior use.

105. Separately, Defendants are liable for common law fraud. Defendants made materially false representations of fact to third parties — including Amazon, Walmart, Balaji Trading, Etsy, and eBay — representing that Plaintiff's products infringed PopSockets' intellectual property. These representations were false when made; Defendants knew they were false (established by 529+ Amazon rulings of no infringement, the PTAB's August 12, 2019 ruling, and PopSockets' July 2, 2025 written admission); Defendants intended to deceive the third parties into removing Plaintiff's products; the third parties justifiably relied on the misrepresentations; and Plaintiff suffered direct financial damages as a proximate result.

106. Defendant Barnett committed fraud by executing sworn declarations to the USPTO on September 13, 2019 (Serial Nos. 88249974 and 88249980) — exactly 32 days after the PTAB's August 12, 2019 Final Written Decision found PopSockets' accordion design was a functional mechanism anticipated by 21-year-old prior art. In Paragraph 4 of the Declaration of David B. Barnett in Support of Non-Functionality, signed under penalty of perjury under 28 U.S.C. § 1746, Barnett stated: 'PopSockets owns U.S. Patent Nos. 9958107, 8856031, and 9367090, covering expandable sockets and docking platforms for portable media players and cases. While each of these patents discloses functionalities of an underlying expandable grip device, none of them claims that the particular ornamental features claimed in the trade dress sought to be registered play any role in attaining such functionality.'

106A. Barnett specifically identified the following five design elements as 'ornamental' and non-functional in his sworn declaration: (a) 'Four inward flares' — the accordion pleats that fold inward; (b) 'Four outward flares' — the accordion pleats that fold outward; (c) 'Inverted conical trunk' — the tapered accordion shape of the grip body; (d) 'Roughly equal diameter top and base' — the structural proportions; and (e) 'Top piece roughly double thickness of base' — the structural thickness design.

106B. These are precisely the features that the PTAB had just ruled functional 32 days earlier in its August 12, 2019 Final Written Decision. The PTAB applied Grinfas GB 2,316,263 — a 1997 reference teaching an expandable folding mechanism with accordion-style pleats — to invalidate Claims 9, 10, 11, 16, and 17 of Patent 8,560,031. The PTAB found the accordion pleating mechanism was functional and anticipated by prior art. Barnett knew this. He had just received the PTAB ruling. He then signed a sworn declaration to the USPTO — 32 days later — claiming those same accordion pleating features (the 'four inward flares,' 'four outward flares,' and

'inverted conical trunk') were purely 'ornamental' and played 'no role in attaining functionality.' This is perjury under 18 U.S.C. § 1621. The direct and irreconcilable conflict between the PTAB's ruling and Barnett's sworn declaration is conclusive documentary evidence of actual, knowing fraud on the USPTO. Plaintiff suffered damages because the fraudulently-obtained trade dress registrations were then used to file hundreds of false enforcement complaints against Plaintiff's products for years afterward. Plaintiff is entitled to compensatory damages, punitive damages, and disgorgement of all benefits Defendants obtained through this fraudulent scheme. USPTO on September 13, 2019 (Serial Nos. 88249974 and 88249980) — exactly 32 days after the PTAB's August 12, 2019 Final Written Decision found PopSockets' accordion design was a functional mechanism anticipated by 21-year-old prior art. In Paragraph 4 of the Declaration of David B. Barnett in Support of Non-Functionality, signed under penalty of perjury under 28 U.S.C. § 1746, Barnett stated: 'PopSockets owns U.S. Patent Nos. 9958107, 8856031, and 9367090, covering expandable sockets and docking platforms for portable media players and cases. While each of these patents discloses functionalities of an underlying expandable grip device, none of them claims that the particular ornamental features claimed in the trade dress sought to be registered play any role in attaining such functionality.' and non-functional in his sworn declaration: (a) 'Four inward flares' — the accordion pleats that fold inward; (b) 'Four outward flares' — the accordion pleats that fold outward; (c) 'Inverted conical trunk' — the tapered accordion shape of the grip body; (d) 'Roughly equal diameter top and base' — the structural proportions; and (e) 'Top piece roughly double thickness of base' — the structural thickness design. earlier in its August 12, 2019 Final Written Decision. The PTAB applied Grinfas GB 2,316,263 — a 1997 reference teaching an expandable folding mechanism with accordion-style pleats — to invalidate Claims 9, 10, 11, 16, and 17 of Patent 8,560,031. The PTAB found the accordion pleating mechanism was functional and anticipated by prior art. Barnett knew this. He had just received the PTAB ruling. He then signed a sworn declaration to the USPTO — 32 days later — claiming those same accordion pleating features (the 'four inward flares,' 'four outward flares,' and 'inverted conical trunk') were purely 'ornamental' and played 'no role in attaining functionality.' This is perjury under 18 U.S.C. § 1621. The direct and irreconcilable conflict between the PTAB's ruling and Barnett's sworn declaration is conclusive documentary evidence of actual, knowing fraud on the USPTO. Plaintiff suffered damages because the fraudulently-obtained trade dress registrations were then used to file hundreds of false enforcement

complaints against Plaintiff's products for years afterward. Plaintiff is entitled to compensatory damages, punitive damages, and disgorgement of all benefits Defendants obtained through this fraudulent scheme. USPTO on September 13, 2019 (Serial Nos. 88249974 and 88249980) — exactly 32 days after the PTAB's August 12, 2019 Final Written Decision found PopSockets' accordion design was a functional mechanism anticipated by 21-year-old prior art. In Paragraph 4 of the Declaration of David B. Barnett in Support of Non-Functionality, signed under penalty of perjury under 28 U.S.C. § 1746, Barnett stated: 'PopSockets owns U.S. Patent Nos. 9958107, 8856031, and 9367090, covering expandable sockets and docking platforms for portable media players and cases. While each of these patents discloses functionalities of an underlying expandable grip device, none of them claims that the particular ornamental features claimed in the trade dress sought to be registered play any role in attaining such functionality.' and non-functional in his sworn declaration: (a) 'Four inward flares' — the accordion pleats that fold inward; (b) 'Four outward flares' — the accordion pleats that fold outward; (c) 'Inverted conical trunk' — the tapered accordion shape of the grip body; (d) 'Roughly equal diameter top and base' — the structural proportions; and (e) 'Top piece roughly double thickness of base' — the structural thickness design. earlier in its August 12, 2019 Final Written Decision. The PTAB applied Grinfas GB 2,316,263 — a 1997 reference teaching an expandable folding mechanism with accordion-style pleats — to invalidate Claims 9, 10, 11, 16, and 17 of Patent 8,560,031. The PTAB found the accordion pleating mechanism was functional and anticipated by prior art. Barnett knew this. He had just received the PTAB ruling. He then signed a sworn declaration to the USPTO — 32 days later — claiming those same accordion pleating features (the 'four inward flares,' 'four outward flares,' and 'inverted conical trunk') were purely 'ornamental' and played 'no role in attaining functionality.' This is perjury under 18 U.S.C. § 1621. The direct and irreconcilable conflict between the PTAB's ruling and Barnett's sworn declaration is proof of actual, knowing fraud on the USPTO. Plaintiff suffered damages because the fraudulently-obtained trade dress registrations were then used to file hundreds of false enforcement complaints against Plaintiff's products for years afterward. Plaintiff is entitled to compensatory damages, punitive damages, and disgorgement of all benefits Defendants obtained through this fraudulent scheme. to the USPTO on September 13, 2019 — 32 days after the PTAB ruled the identical design was functional prior art — representing that the accordion design was 'ornamental, not functional.' Barnett had actual knowledge of the falsity of this statement. Plaintiff

suffered damages because the fraudulently-obtained trade dress registrations were then used to file hundreds of false enforcement complaints against Plaintiff's products. Plaintiff is entitled to compensatory damages, punitive damages, and disgorgement of all benefits Defendants obtained through this fraudulent scheme.

---

### COUNT VIII — CANCELLATION OF TRADE DRESS REGISTRATIONS NOS. 6,005,169 AND 6,005,170 15 U.S.C. § 1119 | Against Defendant PopSockets LLC

107. Plaintiff incorporates by reference all preceding allegations.

108. This Court has authority to order cancellation of registered trademarks pursuant to 15 U.S.C. § 1119, which provides that in any action involving a registered mark, the court may order the cancellation of registrations in whole or in part.

109. Plaintiff seeks cancellation of U.S. Trade Dress Registration Nos. 6,005,169 and 6,005,170 on the following independent grounds, each sufficient standing alone: GROUND 1 — FRAUD ON THE USPTO (15 U.S.C. § 1064(3)): PopSockets procured Registrations 6,005,169 and 6,005,170 (filed January 4, 2019; registered March 10, 2020) through fraud on the USPTO by multiple acts of concealment and false statements: (a) Concealment of Plaintiff's prior patents — Plaintiff filed Design Patent Application No. 29/669,310 on November 23, 2018 (issued as D919,963 S) and Utility Patent Application No. 16/231,521 in December 2018 (issued as Patent **11,320,089 B2**). Both applications were filed and pending before the USPTO when PopSockets filed its trade dress applications on January 4, 2019. PopSockets had a duty of candor under 37 C.F.R. § 11.18 to disclose these prior patent applications as material prior art. PopSockets concealed them from the trademark examiner. Had the examiner known that a competing inventor had filed patents for the identical expandable magnetic phone grip design 42 days earlier, the registrations would not have issued; (b) Concealment of PTAB proceedings and ruling — PopSockets filed its response to the USPTO's Office Action on September 30, 2019, without disclosing that the PTAB had issued its Final Written Decision IPR2018-00497 on August 12, 2019, finding that the identical accordion structure was unpatentable functional prior art. PopSockets actively concealed this directly material ruling from the trademark examiner; (c) Barnett's false declaration — On September 13, 2019 — 32 days after the PTAB ruled the accordion structure was functional prior art — Defendant Barnett executed a sworn declaration to the USPTO under penalty of perjury stating that the accordion

design was 'ornamental, not functional.' The PTAB had ruled the opposite 32 days earlier. Barnett, as a party to the IPR proceedings, had actual personal knowledge of the PTAB ruling. His sworn declaration was knowingly false; and (d) Specimen fraud — The specimen submitted for Registration 6,005,169 was a website screenshot marketing functional product benefits rather than demonstrating trademark use as a source identifier, and PopSockets represented it as a valid specimen of use in commerce. GROUND 2 — FUNCTIONALITY (15 U.S.C. § 1052(e)(5) and TrafFix) — USPTO'S OWN RECORDS PROVE FRAUD: Registrations 6,005,169 and 6,005,170 must be cancelled as covering a functional design. The USPTO's own prosecution records establish this on multiple independent bases: (a) USPTO Automotive Classification — The USPTO examiner classified Registration 6,005,169 under 24 automotive product categories including headlights, brakes, radiators, and windshields. The examiner's own search log shows only 15 seconds of review with zero marks actually examined. A 15-second examination resulting in automotive classification of a phone grip accessory constitutes a manifestly defective examination that would not have occurred had the examiner conducted even minimal review of the functional nature of the accordion design; (b) Examiner Initially Refused on Functionality — The USPTO examiner issued an Office Action on March 28, 2019 refusing registration on functionality grounds. This initial refusal is itself evidence that the design is functional. PopSockets overcame this refusal only through Barnett's September 13, 2019 false declaration — made 32 days after the PTAB ruled the identical design was functional prior art; (c) PopSockets' Own Response Admits Functionality — In its September 30, 2019 response to the Office Action, PopSockets admitted that 'the product as a whole may perform useful functions' and admitted that alternative designs exist. Under TrafFix, an admission that alternative designs exist while claiming the specific design as trade dress is an admission of functionality. PopSockets' own prosecution statements doom the registrations; (d) Specimen Confirms Functionality — The specimen PopSockets submitted for Registration 6,005,169 is a website screenshot marketing functional product benefits including 'New Swappable PopGrips allow you to swap out your PopTops, allow for wireless charging.' This specimen describes functional capabilities, not source identification. A specimen that markets function rather than source is not a valid trademark specimen and simultaneously confirms the design is functional; (e) PopSockets' Own Utility Patent Proves Functionality — PopSockets' own Utility Patent 11,051,592 B2, filed February 11, 2020, describes and claims the same accordion features shown in

Registrations 6,005,169 and 6,005,170 as functional mechanical inventions with Figures 5 and 6 showing mechanical cross-sections. PopSockets cannot simultaneously claim in a utility patent that a design feature is a functional mechanical invention worthy of patent protection and claim in a trademark registration that the same design feature is ornamental trade dress; and (f) Plaintiff's Prior Patents Establish Functionality — Plaintiff's Design Patent Application No. 29/669,310 (filed November 23, 2018) and Utility Patent Application No. 16/231,521 (filed December 2018) both predate PopSockets' January 4, 2019 trade dress applications by 42 days and 11 days respectively. The PTAB's August 12, 2019 ruling in IPR2018-00497 that the identical accordion structure was anticipated by Grinfas (1998) as a functional mechanism means the design was in the functional public domain before PopSockets filed its trade dress applications. GROUND 3 — PRIOR RIGHTS / LIKELIHOOD OF CONFUSION (15 U.S.C. § 1052(d)): Plaintiff's Design Patent D919,963 S was filed November 23, 2018 — 42 days before PopSockets filed the applications that became Registrations 6,005,169 and 6,005,170 on January 4, 2019. Plaintiff's Utility Patent **11,320,089 B2** was filed December 2018 — 11 days before PopSockets' trade dress applications. Plaintiff's commercial use of the expandable magnetic phone grip design commenced April 1, 2018 — more than nine months before PopSockets' applications. PopSockets' own Design Patent D1,098,094 S cites both of Plaintiff's patents as prior art, constituting a formal admission that Plaintiff's designs and technology predate PopSockets' trade dress claims. Plaintiff's prior use, prior patent filings, and prior commercial activity all establish rights that predate and defeat Registrations 6,005,169 and 6,005,170. GROUND 4 — GENERICNESS / FAILURE TO FUNCTION AS A MARK (15 U.S.C. § 1052(e)): The accordion collapsible structure claimed in the registrations is the generic design for expandable phone grip accessories, as established by: (a) Grinfas (1998) disclosing the identical accordion structure 21 years before PopSockets' applications; (b) PTAB's finding that the structure was anticipated by prior art; and (c) multiple competing products using the same structural design. A design that is generic in its product category cannot function as a source identifier and must be cancelled. GROUND 5 — CASE-MATE'S PRIOR RIGHTS IN THE 'POP' WORD MARK (15 U.S.C. § 1052(d)): PopSockets also used U.S. Trademark Registration No. 5,662,835 for the word mark 'POP' — filed December 19, 2017, claiming first use October 22, 2018, granted January 22, 2019 — to file hundreds of false IP complaints against Plaintiff's FAB POPS products. This registration is independently invalid and subject to cancellation because Case-Mate, Inc. holds U.S.

Trademark Registration No. 4,131,330 for the word mark 'POP!' for phone accessories with a first use date of July 29, 2010 — eight years before PopSockets' claimed first use. Under U.S. trademark law, priority belongs to the first user in commerce. Case-Mate's July 29, 2010 first use in the identical goods category (phone accessories) establishes Case-Mate's superior priority. PopSockets had a duty of candor to disclose Case-Mate's prior registration to the USPTO. PopSockets concealed Case-Mate's prior rights when filing its application. The USPTO's own February 2018 suspension notice found another prior user of 'POP!' — confirming the registration should never have been granted. Registration No. 5,662,835 was fraudulently procured and must be cancelled. GROUND 6 — PLAINTIFF'S FAB POPS SUPERIOR PRIOR USE (15 U.S.C. § 1052(d)): Independently of Case-Mate's rights, Plaintiff's own FAB POPS prior use defeats PopSockets' Registration No. 5,662,835. Plaintiff commenced commercial use of the mark FAB POPS for expandable magnetic phone grip accessories on April 1, 2018 — six months and twenty-one days before PopSockets' claimed first use date of October 22, 2018. Plaintiff's April 1, 2018 first use is established by sworn declaration to the USPTO in prior Registration No. 6,665,645 and reaffirmed in current application Serial No. 99501585. When PopSockets filed its intent-to-use application on December 19, 2017, it had an obligation upon submitting its statement of use in 2018 to search for and disclose prior users — including Plaintiff, who was actively selling FAB POPS products at the time. PopSockets concealed Plaintiff's prior use from the USPTO examiner. Plaintiff's superior first-use rights over PopSockets in the identical goods category constitute an independent ground for cancellation of Registration No. 5,662,835.

110. Cancellation of Registrations 6,005,169, 6,005,170, 5,662,835, and 6,556,908 is essential because: (a) Registrations 6,005,169 and 6,005,170 formed the fraudulent basis for PopSockets' 401+ false IP complaints in 2022 after the patent weapon was cancelled; (b) Registration 5,662,835 was used to file false complaints against Plaintiff's FAB POPS products despite Plaintiff's superior first use; (c) Registration 6,556,908 ('AIRBAG') was filed in September 2021 — 30 months after Plaintiff's AIRPOP TECHNOLOGY registration and directly stealing Plaintiff's proprietary 'air bag' terminology from his published utility patent; and (d) all four registrations continue to be used to threaten and suppress Plaintiff's lawful business.

111. Plaintiff respectfully requests that this Court order the Director of the USPTO to cancel U.S. Trade Dress Registration Nos. 6,005,169 and 6,005,170, Word Mark Registration No. 5,662,835, and Word Mark Registration No. 6,556,908 ('AIRBAG') in their entirety pursuant to 15 U.S.C. § 1119.

---

## COUNT X — INDEPENDENT ACTION TO SET ASIDE JUDGMENT FOR FRAUD ON THE COURT Fed. R. Civ. P. 60(d)(3) | Against All Defendants

112. Plaintiff incorporates by reference all preceding allegations.

113. Federal Rule of Civil Procedure 60(d)(3) expressly preserves the power of a court to set aside a judgment for fraud on the court. An independent action under Rule 60(d)(3) is the proper vehicle to challenge a judgment procured through fraud directed at the court itself. Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944); Rozier v. Ford Motor Co., 573 F.2d 1332 (5th Cir. 1978). There is no time limit on a Rule 60(d)(3) independent action for fraud on the court. This action is properly filed in this Court because the judgment sought to be vacated — entered in Case No. 1:22-cv-04521-SCJ — was entered by this Court. An independent action to vacate a judgment for fraud on the court must be brought in the court that rendered the judgment. Bankers Mortgage Co. v. United States, 423 F.2d 73 (5th Cir. 1970).

114. The Default Judgment and Its Procurement. On January 8, 2024, this Court entered a default judgment in Case No. 1:22-cv-04521-SCJ (Doc. 34) ('Default Judgment'). The Default Judgment's own text reveals its illegitimacy: PopSockets requested no specific damages and no injunctive relief — the Order states 'nothing further remains for the Court's consideration' and directed the Clerk to close the case. A trademark plaintiff that wins a default judgment but seeks no damages and no injunction did not file the case to vindicate IP rights — it filed the case as a procedural weapon to obstruct Plaintiff's TTAB cancellation proceedings.

114A. PopSockets' Own Wrongful Conduct and Fraudulent Service Caused the Default. The selective accuracy of PopSockets' service attempts is direct evidence of intentional fraud on this Court, not inadvertence. PopSockets correctly served Plaintiff at his actual address in November 2022 — demonstrating that PopSockets had the ability and resources to locate defendants accurately. PopSockets simultaneously used stale, invalid addresses for Yer Thao and Alu Solomon Chukwu. The same investigation that found Plaintiff's correct address would have identified that the

addresses used for Plaintiff's business partners were invalid. The simultaneous use of a correct address for Plaintiff and known-invalid addresses for his business partners is direct evidence of a deliberate scheme to deny Plaintiff's partners due process notice while technically satisfying service requirements as to Plaintiff — thereby ensuring Plaintiff would be bound by any judgment while his partners could be excluded at PopSockets' discretion. This constitutes the 'scheme to interfere with the judicial machinery itself' required under Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944). Plaintiff was properly served with the Complaint in November 2022. However, the sustained destruction of Plaintiff's business revenue by PopSockets' false complaint campaign — which had been ongoing since 2018 — severely disrupted Plaintiff's ability to operate his business and respond to the lawsuit during the pendency of the Prior Case. PopSockets' July and September 2023 correspondence was sent to Box #282 (the wrong box — Plaintiff's box is #122), signed by a stranger 'J. BLOCKEM/BLOCKUM,' ensuring Plaintiff received no post-filing case communications. The March 30, 2023 Amended Answer deadline was missed as a direct result of the business disruption caused by PopSockets' ongoing false complaint campaign.

114B. Equitable Estoppel and Unclean Hands. PopSockets cannot obtain and retain a default judgment when PopSockets' own tortious conduct directly caused the circumstances leading to that default. The causal chain is direct and unbroken: (1) PopSockets files 557+ false IP complaints, 2018 onward; (2) false complaints destroy Plaintiff's business revenue; (3) revenue destruction causes severe business disruption, impairing Plaintiff's ability to respond to the lawsuit during the pendency of the Prior Case; (4) PopSockets' July and September 2023 FedEx correspondence goes to Box #282 (wrong box, signed by stranger 'J. BLOCKEM/BLOCKUM') — Plaintiff receives no case communications; (5) default entered for failure to comply with court deadlines; (6) Default Judgment entered January 8, 2024, seeking no damages and no injunction — having achieved the true purpose: a court finding to wield against Plaintiff at the TTAB. Courts of equity will not permit a wrongdoer to benefit from the consequences of their own wrong. PopSockets is therefore equitably estopped from retaining the benefit of a default judgment that resulted from its own antecedent wrongdoing.

115. Fraud on this Court — Misrepresented Pre-Litigation Demand Letters. In opposing Plaintiff's Motion to Vacate, PopSockets filed the Declaration of Ian

Washburn (Doc. 39) attaching FedEx delivery receipts for two private pre-litigation demand letters — not court-issued process — as purported evidence that Plaintiff had actual notice of PopSockets' claims: (a) July 6, 2023 letter — PopSockets addressed this letter to 'Suite C #282' — the wrong box number. Plaintiff's actual box is #122, not #282. The FedEx delivery receipt shows delivery to '1498 Buford Hwy Ste C' with no box number specified, signed by 'J. BLOCKEM' on July 10, 2023. 'J. BLOCKEM' is not Louis Fabec and had no authority to accept mail on Plaintiff's behalf; (b) September 22, 2023 letter — Similarly addressed to the wrong box, delivered to '1498 Buford Hwy' with no box number, signed by 'J. BLOCKUM' on September 25, 2023 — again, not Plaintiff; (c) The Ian Washburn Declaration stated: 'Attached as Exhibit 2 is a true and correct copy of a FedEx proof of delivery for the letter attached as Exhibit 1' — representing to this Court that the delivery receipts proved Plaintiff received actual notice. This representation was materially false and misleading. The receipts showed delivery to the wrong box number, signed by a stranger. Plaintiff never received either letter; (d) The October 24, 2024 Order denying Plaintiff's Motion to Vacate specifically stated: 'the exhibits show that the letters at issue were signed for by someone named J. BLOCKEM' — demonstrating the Court relied on PopSockets' misrepresentation in denying relief to Plaintiff. The Court was told these receipts proved actual notice. They proved the opposite — delivery to the wrong person at the wrong box.

116. The case was ultimately dismissed without prejudice — PopSockets obtained a default judgment but no damages, no injunction, and no meaningful relief. The case's termination without prejudice, combined with PopSockets' July 2, 2025 written admission that its underlying IP claims were 'improper' and 'false,' establishes both the meritlessness of the Prior Case and its function as a pure procedural weapon to obstruct Plaintiff's TTAB cancellation proceedings.

117. Plaintiff requests that this Court, pursuant to its inherent authority and Fed. R. Civ. P. 60(d)(3): (a) vacate the Default Judgment entered on January 8, 2024 in Case No. 1:22-cv-04521-SCJ; (b) declare that the purported service on Yer Thao and Alu Solomon Chukwu was void ab initio as service was directed to addresses PopSockets knew were stale and invalid, and that any judgment purporting to bind them is void for lack of proper service and due process; and (c) award Plaintiff all damages attributable to the fraudulent litigation including legal costs, lost business opportunities, reputational harm, and damages flowing from the fraudulent obstruction of Plaintiff's TTAB cancellation proceedings.

## COUNT IX — MALICIOUS PROSECUTION / WRONGFUL USE OF CIVIL PROCEEDINGS

118. Plaintiff incorporates by reference all preceding allegations.

119. Defendants initiated and maintained over 557 false IP enforcement proceedings against Plaintiff before Amazon Brand Registry, Etsy, and eBay — each constituting a civil proceeding within the meaning of Georgia's tort of wrongful use of civil proceedings. O.C.G.A. § 51-7-80 et seq. Additionally, Defendants instituted Case No. 1:22-cv-04521-SCJ in this Court against Plaintiff.

120. Defendants initiated each of these proceedings without probable cause. Probable cause is conclusively negated by: (a) Amazon's rulings against Defendants in over 529 separate appeal proceedings, each affirmatively finding no infringement; (b) the March 12, 2021 cancellation of PopSockets' core patent claims, eliminating any patent basis for enforcement after that date; and (c) PopSockets' own July 2, 2025 written admission that its complaints were 'improper' and 'false.'

121. Defendants acted with malice — defined as a primary purpose other than securing the proper adjudication of the claim. The primary purpose of Defendants' complaint campaign was market suppression, not IP protection, as evidenced by: continuation of complaints for years after 529 findings of no infringement; escalation to 401+ complaints in 2022 after losing the patent weapon; direct interference with Plaintiff's Walmart and Balaji business relationships; and the July 2025 written admission of falsity.

122. The proceedings terminated in Plaintiff's favor: (a) Case No. 1:22-cv-04521-SCJ was ultimately dismissed without prejudice. Critically, prior to the final dismissal, PopSockets never properly served either Alu Solomon Chukwu or Yer Thao — despite naming them as defendants. Yer Thao was served at a closed distribution center he no longer operated. Alu Solomon Chukwu was served at a residential address he had vacated approximately 18 months prior. Both service attempts were deliberately directed at addresses PopSockets knew were stale or invalid. As a result, neither Alu Chukwu nor Yer Thao ever received service of process, never knew they had been named as federal defendants, and never had an opportunity to respond to or defend against the claims. PopSockets obtained a default judgment bearing their names without ever actually serving them. Their inclusion in the lawsuit served a

singular purpose: to use Plaintiff's business partners as named federal defendants — creating reputational harm and personal liability exposure — without ever giving them due process notice. This constitutes both fraud on the Court and a violation of the due process rights of Alu Solomon Chukwu and Yer Thao. PopSockets did not prevail on any claim and obtained no damages and no injunction, which was all it ever sought, proving the lawsuit was filed solely as a procedural weapon; (b) Plaintiff's counterclaims were dismissed without prejudice, preserving them for reassertion herein; (c) Amazon ruled in Plaintiff's favor in over 529 separate enforcement proceedings; and (d) PopSockets' July 2, 2025 written retraction constitutes a voluntary abandonment and admission that the underlying IP claims were meritless from inception.

123. Plaintiff suffered special damages including permanent closure of marketplace accounts, loss of the Walmart distribution agreement, loss of the Balaji partnership, destruction of American manufacturing operations, and legal costs incurred in defending the Prior Case. Plaintiff is entitled to compensatory and punitive damages.

---

## COUNT XI — ABUSE OF PROCESS

127. Plaintiff incorporates by reference all preceding allegations.

124. Defendants used the legal process — specifically the Prior Case and the IP complaint systems — for an ulterior purpose and in a manner not proper in the regular conduct of proceedings: to obstruct TTAB proceedings, to intimidate Plaintiff's business partners Yer Thao and Alu Solomon Chukwu through personal liability threats, and to destroy Plaintiff's business relationships rather than to protect legitimate IP rights.

124A. The abuse of process is most clearly demonstrated by PopSockets' April 15, 2025 use of the fraudulently-obtained default judgment as an enforcement weapon. On that date, PopSockets transmitted a threatening message to Plaintiff's Shopify storefront stating: 'You are hereby ordered to immediately cease and desist from selling your product in accordance with case 1:22-cv-04521... You lost your appeal we will shut down this website.' A court judgment obtained through the fraudulent service scheme described herein was then immediately weaponized to threaten shutdown of Plaintiff's business website — a purpose entirely outside the legitimate scope of trademark enforcement and squarely within the definition of abuse of process.

124B. The full scope of platform destruction accomplished through abuse of the IP complaint process includes: (1) permanent termination of Plaintiff's Etsy account on August 23, 2018 — accomplished through a deliberate 28-day escalating complaint campaign using Patent 8,560,031 while that patent was under active IPR challenge; (2) permanent closure of Plaintiff's eBay seller account; (3) 557+ false complaints on Amazon requiring 529+ successful appeals; (4) termination of Plaintiff's ZizoWireless/Balaji distribution relationship through a sworn complaint to a third-party distributor; (5) suppression of Plaintiff's Walmart distribution opportunity; and (6) ongoing suppression of Plaintiff's FAB POPS Amazon storefront and website through the threatened shutdown of April 15, 2025.

125. Plaintiff suffered damages as a direct and proximate result. Plaintiff is entitled to compensatory and punitive damages.

---

## STATUTE OF LIMITATIONS — STATE LAW CLAIMS

125A. All state law claims in this Complaint are timely under the applicable statutes of limitations for the following independent reasons: (a) Continuing Tort — Defendants' tortious conduct was not a single completed act but a continuous, ongoing course of conduct spanning from 2018 through the present day. Under Georgia's continuing tort doctrine, the statute of limitations does not begin to run until the tortious conduct ceases. Defendants' false IP complaint campaign, their suppression of Plaintiff's business, and their sale of infringing products all continue through the filing date of this Complaint, April 22, 2026; (b) Fraudulent Concealment Tolling — Defendants fraudulently concealed the true nature and extent of their coordinated scheme from Plaintiff. PopSockets' July 2, 2025 written admission that its complaints were 'improper' and 'false' was the first time Defendants acknowledged the fraudulent nature of the campaign. The statute of limitations was tolled until Plaintiff discovered, or through reasonable diligence could have discovered, the full extent of Defendants' coordinated conduct; (c) Acts Within the Limitations Period — The 2025 inventory quarantine (February 6 – July 2025), the Walmart direct sales of infringing products (ongoing through April 22, 2026), the Amazon direct sales of infringing products (ongoing through April 22, 2026), and the PopSockets July 2, 2025 retraction all occurred within any applicable limitations period; and (d) Discovery Rule — Plaintiff did not discover and could not through reasonable diligence have discovered the full

extent of Defendants' coordinated conspiracy — including the Walmart-PopSockets coordination, the Amazon-PopSockets coordination, and the fraudulent USPTO filings — until PopSockets' July 2, 2025 written admission confirmed the fraudulent nature of the entire campaign.

---

### COUNT XII — TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

(Walmart Distribution Agreement — Against PopSockets LLC and David Barnett)

126. Plaintiff incorporates by reference all preceding allegations.

127. Plaintiff had a business relationship and prospective national retail distribution agreement with Walmart Inc. In June 2022, Plaintiff attended Walmart's Open Call program at Walmart headquarters in Bentonville, Arkansas, where Walmart buyers expressed 100% interest in moving forward with Plaintiff's products. A Walmart Vice President of Accessories then intervened and stated directly to Plaintiff and his partner Alu Solomon Chukwu: 'We're looking out for PopSockets' — a direct oral admission of Walmart's agreement with PopSockets to exclude Plaintiff.

128. On August 12, 2022 — 45 days after the Open Call — Walmart Trust & Safety sent Plaintiff an email in Case No. 03955217, authored by Walmart Trust & Safety representative 'Leo,' which stated in full relevant part: 'I understand that you have reached out via claim IPRR0096729 to appeal the patents you have. However, at this time a business decision has been made to remove the items in question. We will not be able to publish these items at this time and will notify you if there are any changes. In the meantime we ask that you please reach out to the claimant at the contact below directly to resolve this matter: Name of Claimant: PopSockets LLC / Contact Person: Annie Haselfeld / Email Address: brandprotection@popsockets.com 3032236922.' / Phone Number:

129. Three facts established by this letter are independently probative on the question of liability: (a) Walmart acknowledged Plaintiff's patents — 'appeal the patents you have' — confirming Walmart had actual notice of Plaintiff's superior patent rights before making its decision; (b) Walmart characterized its removal as a 'business decision' — not an IP determination — confirming the removal was commercially motivated to protect PopSockets rather than to enforce legitimate IP rights; and (c) Walmart directed Plaintiff to contact PopSockets LLC's Annie Haselfeld at brandprotection@popsockets.com to 'resolve this matter' — directing a patent holder

to negotiate with the infringer proves direct coordination between Walmart and PopSockets. Twelve days after this letter, on August 24, 2022, Annie Haselfeld — the exact PopSockets employee Walmart identified — filed 18 new simultaneous false complaints against Plaintiff on Amazon.

130. Defendants PopSockets and Barnett intentionally interfered with this business relationship through improper means including false IP complaints and direct communications with Walmart asserting false IP claims, exercising PopSockets' commercial relationship with Walmart to exclude Plaintiff from national retail distribution.

131. The interference is further evidenced by the following irony: As of April 22, 2026, Walmart is actively selling the PopSockets MagSafe PopGrip — an infringing product — labeled 'Sold and shipped by Walmart' at $19.95 per unit with same-day availability at the Buford Drive Buford Supercenter. Walmart removed Plaintiff's lawful patented products in August 2022 citing a 'business decision,' and is now itself directly selling the infringing product that displaced Plaintiff's goods from the market. Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

---

## COUNT XIII — TORTIOUS INTERFERENCE WITH CONTRACT

(Balaji Trading Agreement — Against All Defendants)

132. Plaintiff incorporates by reference all preceding allegations.

133. Plaintiff had a valid and enforceable exclusive distribution agreement with Balaji Trading, Inc. dated September 1, 2018, providing for annual distribution volumes of up to 1,000,000 units through Cricket Wireless retail channels, representing a substantial business opportunity.

134. Defendants knew of this agreement and intentionally interfered with it through the systematic false IP complaint campaign, which created pervasive IP risk surrounding Plaintiff's products and caused Balaji Trading to lose confidence in the partnership and ultimately terminate the agreement.

135. Defendants' interference was through improper means — the submission of hundreds of admittedly false IP complaints.

136. Plaintiff suffered substantial damages in lost Balaji partnership value in an amount to be determined at trial. Plaintiff is entitled to compensatory and punitive damages.

136A. Additional Distribution Interference — Valor Communications. Plaintiff further had an established distribution relationship with Valor Communications, a wireless accessories distributor. Valor Communications carried Plaintiff's FAB POPS products until Defendants' false complaint campaign created the same pattern of reputational and enforcement risk that drove other distribution partners away from Plaintiff. Valor Communications subsequently became an authorized PopSockets distributor — following the identical pattern established by Balaji Trading and documented with Cesium Telecom. Each instance in which a Plaintiff distribution partner discontinued carrying Plaintiff's products and subsequently joined PopSockets' authorized distribution network constitutes an additional act of tortious interference and a further element of the vertical market foreclosure described in Count V.

---

## COUNT XIV — DEFAMATION AND TRADE LIBEL

137. Plaintiff incorporates by reference all preceding allegations.

138. Defendants published false statements of fact to third parties, including Amazon, Etsy, eBay, Walmart, and Balaji Trading, asserting that Plaintiff's products infringed PopSockets' intellectual property rights.

143. These statements were false when made. Defendants knew they were false, as established by: Amazon's 529+ rulings of no infringement — every single PopSockets complaint against Plaintiff's products from 2022 through 2025 was found without merit by Amazon's own enforcement system; PTAB's cancellation of PopSockets' primary patent claims in March 2021; Plaintiff's prior patent rights predating PopSockets' applications; and PopSockets' own July 2, 2025 written admission that its complaints were "improper" and "false"; and the USPTO's April 10, 2026 official finding in Nonfinal Office Action for Serial No. 99501585 that FAB POPS does not conflict with any registered or pending mark — including PopSockets' POP trademark Registration No. 5,662,835 — under Trademark Act Section 2(d), constituting a government agency official determination that PopSockets' trademark-based enforcement complaints against Plaintiff's FAB POPS products were legally unfounded.

139. Defendants published these false statements with actual malice — knowledge of their falsity or reckless disregard for their truth or falsity.

140. Plaintiff suffered special damages in the form of lost business relationships, destroyed partnerships, and terminated marketplace accounts. Plaintiff is entitled to compensatory and punitive damages.

---

## COUNT XV — UNFAIR COMPETITION

141. Plaintiff incorporates by reference all preceding allegations.

142. Defendants' conduct, including the systematic filing of false IP complaints, fraud on the USPTO, fraudulent federal litigation, and direct interference with Plaintiff's distribution relationships, constitutes unlawful and unfair business practices that violate common law principles of fair competition.

143. Defendants' conduct has caused substantial harm to Plaintiff and to competition in the expandable phone grip market. Plaintiff is entitled to injunctive relief and damages.

---

## COUNT XVI — TRADEMARK INFRINGEMENT OF U.S. REGISTRATION NO. 6,125,522 (AIRPOP TECHNOLOGY) 15 U.S.C. § 1114 | Against All Defendants

144. Plaintiff incorporates by reference all preceding allegations.

145. Plaintiff is the owner of U.S. Trademark Registration No. 6,125,522 for the mark AIRPOP TECHNOLOGY, Serial No. 88330770, registered August 11, 2020, for expandable magnetic phone grip accessories and related goods. The AIRPOP TECHNOLOGY mark is valid, subsisting, and incontestable. Plaintiff owns this registration in his individual capacity. infringed and continue 127. Defendants have TECHNOLOGY mark through two independent acts: infringe Plaintiff's AIRPOP (a) Product Name Infringement — PopSockets now sells a product marketed as the 'Airbag Jelly Bear — MagSafe PopGrip,' using the term 'Airbag' as a product identifier in direct competition with Plaintiff's AIRPOP TECHNOLOGY registered mark in the identical goods category; and (b) Trademark Registration Theft — In September 2021 — 30 months after Plaintiff registered AIRPOP TECHNOLOGY and after Plaintiff's utility patent was published on July 9, 2020 using the term 'air bag' — PopSockets

filed a trademark application for 'AIRBAG' which was granted as Registration No. 6,556,908 on November 9, 2021. PopSockets read Plaintiff's published patent, saw the 'air bag' terminology, and filed a trademark application for the identical term to use against Plaintiff. This constitutes both trademark infringement of Plaintiff's prior AIRPOP TECHNOLOGY registration and fraud on the USPTO — PopSockets failed to disclose Plaintiff's prior AIRPOP TECHNOLOGY registration when filing the AIRBAG application for identical goods.

146. The likelihood of confusion between Plaintiff's registered AIRPOP TECHNOLOGY mark and Defendants' use of 'Airbag' as a product designator is established by: (a) similarity of the marks — both use 'air' combined with a descriptor for expandable bag/pop technology in the context of phone grip accessories; (b) identity of goods — both are used in connection with expandable magnetic phone grip accessories; (c) identity of channels of trade — both sold on Amazon and through retail channels; (d) Defendants' actual knowledge of Plaintiff's AIRPOP TECHNOLOGY mark — PopSockets' seven-year surveillance of Plaintiff's products and patents means it knew of the AIRPOP TECHNOLOGY registration; and (e) bad faith — PopSockets adopted 'Airbag' as a product name after Plaintiff's patent repeatedly used 'air bag' as the core claim term, and after PopSockets' own citation of Plaintiff's patents as prior art.

147. Plaintiff's registered AIRPOP TECHNOLOGY mark has priority over Defendants' use of 'Airbag' as a product designator. Defendants' infringement is willful given their actual knowledge of Plaintiff's registration.

148. Plaintiff is entitled to Defendants' profits from infringing sales, actual damages, enhanced damages for willful infringement, attorney's fees, and a permanent injunction under 15 U.S.C. §§ 1114, 1116, and 1117.

---

## COUNT XVIII — DECLARATORY JUDGMENT OF NON-INFRINGEMENT AND SENIOR USER STATUS

(28 U.S.C. §§ 2201-2202; Against PopSockets LLC)

149. Plaintiff incorporates by reference all preceding allegations.

150. An actual, justiciable controversy exists between Plaintiff and PopSockets regarding whether Plaintiff's FAB POPS products infringe any valid and enforceable

intellectual property right of PopSockets. PopSockets has asserted IP rights against Plaintiff's products in 557+ enforcement actions, filed a federal lawsuit against Plaintiff, and continued asserting IP claims through the filing date of this Complaint. Plaintiff requires a declaratory judgment to provide the legal certainty necessary to resume full commercial operations and re-engage with retail and distribution partners who have declined to carry Plaintiff's products due to fear of PopSockets' enforcement.

151. Plaintiff is entitled to a Declaratory Judgment establishing: (a) Non-Infringement — Plaintiff's FAB POPS expandable magnetic phone grip products do not infringe any valid and enforceable trademark, trade dress, or patent right of PopSockets LLC. Amazon's 529+ findings of no infringement, PopSockets' July 2, 2025 written admission that its complaints were 'improper' and 'false,' and the USPTO's April 10, 2026 finding of no conflict between FAB POPS and PopSockets' POP trademark collectively establish non-infringement as a matter of law; (b) Senior User Status — Plaintiff is the senior user of the FAB POPS mark and of expandable air bag magnetic phone grip technology in commerce. Plaintiff's commercial use of FAB POPS commenced April 1, 2018 — six months before PopSockets' claimed first use of October 22, 2018. Plaintiff's design patent was filed November 23, 2018 — 42 days before PopSockets' trade dress applications filed January 4, 2019. Plaintiff's utility patent priority date is December 24, 2018 — 11 days before PopSockets' trade dress applications. As the senior user in both time and patent priority, Plaintiff's rights are superior to any PopSockets trademark or trade dress registration covering expandable magnetic phone grip products. This senior user status has a critical legal consequence that runs through every claim in this Complaint: every complaint PopSockets filed against Plaintiff's FAB POPS products using the POP trademark or PopSockets' trade dress registrations was a knowingly false assertion of priority. PopSockets cannot assert superior trademark or trade dress rights against a senior user — and PopSockets knew Plaintiff's commercial use predated its own. Each of the 557+ complaints was therefore not merely meritless as to infringement; it was a knowingly false statement of priority filed to suppress a competitor whose rights were legally superior; and (c) Right to Carry — A declaration that any retailer, distributor, or commercial partner that carries, sells, or distributes Plaintiff's FAB POPS products does not thereby infringe any valid and enforceable intellectual property right of PopSockets LLC. This declaratory relief is specifically requested to remedy the market

foreclosure documented in Paragraphs 45A and 45B — where Cesium Telecom's managing director confirmed in writing that Cesium could not carry Plaintiff's products because it could not go up against PopSockets — and to provide the legal certainty necessary for retail and distribution partners to carry Plaintiff's products without fear of retaliatory enforcement.

152. A declaratory judgment of non-infringement and senior user status is necessary and appropriate because: (a) it will resolve the cloud of uncertainty that PopSockets' seven-year enforcement campaign has placed over every commercial relationship Plaintiff has attempted to establish; (b) it will provide retail and distribution partners with a judicial determination they can rely upon; and (c) without such a declaration, the vertical foreclosure of Plaintiff's distribution channels will continue indefinitely regardless of any other relief granted.

---

## COUNT XVII — UNJUST ENRICHMENT

153. Plaintiff incorporates by reference all preceding allegations.

154. Defendants have been unjustly enriched at Plaintiff's expense by: (a) retaining profits from the sale of products that infringe Plaintiff's patents; (b) maintaining market position and revenues that rightfully belong to Plaintiff as the prior patent holder; and (c) benefiting from the systematic destruction of Plaintiff's competing business.

155. It would be inequitable for Defendants to retain the benefits conferred at Plaintiff's expense. Plaintiff is entitled to disgorgement of Defendants' profits and restitution.

---

## DAMAGES

161. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered the following categories of damages: (a) Lost Walmart distribution revenues: in an amount to be determined at trial based on the scope of the national retail distribution agreement opportunity; (b) Lost Balaji Trading/Cricket Wireless partnership revenues: in an amount to be determined at trial, based on contractual volume commitments of up to 1,000,000 units per year through Cricket Wireless retail channels; (c) Lost sales attributable to platform suppression and false complaint campaign, 2018–2025: in an

amount to be determined at trial; (d) Destruction of Plaintiff's American manufacturing operations; (d-1) Warehouse and Manufacturing Operations Damages — The revenue destruction caused by Defendants' false complaint campaign directly caused the loss of Plaintiff's warehouse operations and the collapse of Plaintiff's $52,200 U.S. manufacturing investment with DRC Components and Steven Plastics. PopSockets then obtained a default judgment — having caused the business disruption that led to the missed deadline — compounding the harm through fraudulent FedEx service to Box #282 as described herein; (e) Patent infringement damages — Plaintiff has identified 383 or more separate PopSockets MagSafe product listings on Amazon.com alone, all sold as infringing kits with included adapter rings (Exhibit F). Based on live Amazon sales data as of April 21, 2026, the primary infringing SKU alone shows 9,000+ units sold per month at $19.99–$35.00 per unit, with Amazon.com as the direct Shipper/Seller. Aggregate infringing sales across all 383 documented MagSafe kit listings, all retail channels, and the full product history from patent issuance (May 3, 2022) to present represent damages in an amount to be determined at trial; (f) Plaintiff's own Amazon sales data as of April 22, 2026 — the filing date of this Complaint — documents the complete trajectory of Defendants' ongoing suppression. Plaintiff will present expert testimony from a qualified e-commerce data analytics expert to quantify the full algorithmic suppression damages, translating the documented sales trajectory — peak of approximately 145 units per month following the retraction, collapsing to \/bin/sh.00 on the filing date — into specific dollar values for lost revenue, lost growth, permanent algorithmic ranking damage, and the cost of restoring marketplace visibility. Amazon's own reinstatement email confirmed that even after clearing the complaint, the listings "may still be inactive" — establishing that the algorithmic damage is ongoing and not self-correcting. This constitutes Permanent Impairment of Intangible Marketplace Assets — including Search Rank, Sales Velocity, Conversion Rate History, and Customer Review accumulation weight — none of which recover automatically upon reinstatement and all of which require sustained uninterrupted sales that the suppression itself prevents. Expert testimony will quantify each category of permanent intangible asset impairment as a separate, recoverable element of damages. Plaintiff's Amazon Seller dashboard shows: (i) 850 units sold from April 1, 2025 through April 22, 2026 — down 31% from the prior period; (ii) a brief recovery to approximately 145 units in May 2025 following the June 2, 2025 quarantine clearance and July 2, 2025 retraction, demonstrating that the market responded when the false

complaint campaign momentarily ceased; (iii) a sustained decline from the September 2025 forward as algorithmic suppression caused by seven years of false complaints reasserted itself; (iv) sales collapsing to approximately 10-15 units per month by March-April 2026; and (v) as of the moment this Complaint is filed on April 22, 2026: $0.00 in sales today, 0 units ordered today, and 0 open orders. The chart's shape tells the entire story of this case — a brief window of recovery when the false complaints stopped, followed by collapse as the accumulated algorithmic damage from seven years of suppression proved irreversible without court intervention. Defendants' infringing products selling 10,000+ units per month on Amazon.com; Plaintiff's competing patented products selling zero units on the same day this Complaint is filed; (f) Costs of responding to 557+ false complaints and related legal proceedings; (g) Reputational and business damages from false IP accusations published to major retail partners; (h) Treble damages on patent infringement, RICO, and antitrust claims; (i) Disgorgement of Defendants' profits from infringing and unfair competition conduct; (j) Ongoing royalty for future infringement; (k) Punitive damages for malicious and willful conduct; and (l) Attorney's fees and costs under 35 U.S.C. § 285, 15 U.S.C. § 15, and 18 U.S.C. § 1964.

---

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Louis Francis Fabec respectfully requests that this Court enter judgment in his favor and against all Defendants — PopSockets LLC, David Barnett, Walmart Inc., Amazon.com, Inc., and Amazon.com Services LLC, jointly and severally as applicable to each count — and grant the following relief:

**A. A declaration that Defendants have infringed independent Claim 13 of U.S. Patent No. 11,320,089 B2;**

B. An award of compensatory damages for patent infringement of **Claim 13**, including lost profits and a reasonable royalty, in an amount to be determined at trial but no less than a reasonable royalty on the documented minimum of 9,000 infringing units sold per month at current retail pricing, together with enhanced damages up to three times pursuant to 35 U.S.C. § 284 for willful infringement;

C. A permanent injunction enjoining Defendants from infringing **Claim 13** of the '089 Patent, including enjoining the manufacture, importation, marketing, sale, and

distribution of any expandable magnetic phone grip sold as a kit with an included metal adapter disc — Defendants' own Instagram post dated April 21, 2026 confirms active ongoing infringing sales as of the filing date, establishing immediate irreparable harm warranting injunctive relief;

**E. An award of treble damages under 18 U.S.C. § 1964(c) for RICO violations;**

**F. An award of treble damages under 15 U.S.C. § 15 for antitrust violations;**

G. An order vacating the default judgment entered in Case No. 1:22-cv-04521-SCJ and dismissing with prejudice all claims against Yer Thao and Alu Solomon Chukwu;

H. An order pursuant to 15 U.S.C. § 1119 directing the Director of the USPTO to cancel U.S. Trade Dress Registration Nos. 6,005,169 and 6,005,170, Word Mark Registration No. 5,662,835, and Word Mark Registration No. 6,556,908 ('AIRBAG') in their entirety;

I. An award of Defendants' profits, actual damages, and enhanced damages for willful infringement of Plaintiff's AIRPOP TECHNOLOGY trademark (Registration No. 6,125,522), and a permanent injunction enjoining Defendants' use of 'Airbag' or confusingly similar designations in connection with competing phone grip products;

**J. An award of compensatory and punitive damages for tortious interference, malicious prosecution, abuse of process, defamation, and unfair competition;**

**J. Disgorgement of all profits unjustly obtained by Defendants at Plaintiff's expense;**

**K. An award of reasonable attorney's fees and costs pursuant to 35 U.S.C. § 285, 15 U.S.C. § 15, 18 U.S.C. § 1964, and applicable law;**

**L. Pre-judgment and post-judgment interest;**

M. A Specific Conduct Injunction directed at Amazon's IP enforcement mechanisms, specifically prohibiting Amazon.com, Inc. and Amazon.com Services LLC from accepting, processing, or enforcing any IP complaint filed by PopSockets LLC against Plaintiff's specific product ASINs — including but not limited to B0DPTX24MC, B0D9YXF5K6, B0DF5QXCVC, B07KDVS9Z6, B07FDJPXZJ, and B09YKXH8LP — without prior judicial determination of infringement by a court of competent jurisdiction.

The 529-to-0 appeal record establishes that Amazon's standard notice-and-takedown process has been irreparably weaponized against Plaintiff; the only remedy that prevents continuation of this procedural weapon is judicial pre-clearance of any future complaint by the same complainant against the same products;

N. A Declaratory Judgment of Non-Infringement establishing that Plaintiff's FAB POPS expandable magnetic phone grip products — covered by U.S. Patent No. **11,320,089 B2**, Design Patent No. D919,963 S, and Design Patent No. D1,107,416 S — do not infringe any valid and enforceable intellectual property right of PopSockets LLC, and that Plaintiff as the senior user of FAB POPS (first commercial use April 1, 2018) has superior rights to any PopSockets trademark or trade dress registration covering expandable phone grip products; and

O. Such other and further relief as this Court deems just and proper. NOTICE OF ANTICIPATED SPOLIATION AND PRESERVATION DEMAND Plaintiff hereby provides formal notice to all Defendants and their counsel that the following categories of evidence are material to this action and must be preserved immediately upon receipt of this Complaint: (a) All Amazon Brand Registry complaint submissions, internal processing notes, reviewer comments, appeal determinations, and account health records relating to any complaint filed by PopSockets LLC against Plaintiff's seller accounts or ASINs from 2018 through the present — including all 529+ appeal proceedings in which Amazon found no infringement; (b) All internal Amazon communications, emails, Slack messages, or operational notes discussing PopSockets LLC's complaint filing patterns, the volume or repetitive nature of PopSockets' complaints, Plaintiff's seller account status, or any flag, review, or escalation triggered by the volume of PopSockets' filings; (c) All agreements, contracts, communications, or commercial arrangements between Amazon and PopSockets LLC relating to Brand Registry access, complaint filing privileges, APEX enrollment, direct sales arrangements, or any preferential enforcement treatment; (d) All PopSockets internal communications, emails, or records discussing the filing of IP complaints against Plaintiff's products, the results of those complaints, or strategy for using the complaint process to suppress Plaintiff; (e) All Walmart internal communications regarding Plaintiff's Open Call application, the VP's 'looking out for PopSockets' statement, the August 12, 2022 'business decision' email, and any subsequent communications with PopSockets regarding Plaintiff. Failure to preserve this evidence will support an adverse inference instruction at trial.

**DEMAND FOR JURY TRIAL Pursuant to the Seventh Amendment to the United States Constitution and <u>Federal Rule of Civil Procedure 38(b)</u>, Plaintiff Louis Francis Fabec hereby demands a trial by jury on ALL issues so triable, including without limitation: (a) All patent infringement claims and associated damages under Count I; (b) All RICO claims and mandatory treble damages under Counts II and III; (c) All antitrust claims and treble damages under Counts IV and V; (d) All Lanham Act false advertising claims and damages under Count VI; (e) All factual issues underlying the trademark cancellation counts, including fraud on the USPTO, prior use dates, and Case-Mate's priority rights, under Count VIII; (f) All fraud, malicious prosecution, abuse of process, tortious interference, defamation, and unfair competition claims and associated compensatory and punitive damages under Counts VII and IX through XVI; and (g) The amount of all damages on any and all counts. The equitable relief sought — including trademark cancellation, injunction, and disgorgement — shall be determined by the Court following the jury's verdict on all legal claims.**

Respectfully submitted,

*Louis Fabec*

**Louis Francis Fabec**
Pro Se Plaintiff
1498 Buford Highway Suite C #122
Buford, Georgia 30518
Telephone: (404) 313-0071
Email: louis@fabpops.com

Date: ~~05/05/2026~~ *or June 2, 2026*

**VERIFICATION I, Louis Francis Fabec, hereby declare under penalty of perjury under the laws of the United States of America that I am the Plaintiff in the above-captioned action, that I have read the foregoing Complaint, and that the facts alleged therein are true and correct to the best of my knowledge,**

**information, and belief. Louis Francis Fabec**